RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 05a0340p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

AMERICAN-ARAB ANTI-DISCRIMINATION
COMMITTEE, a non-profit organization; and IMAD
CHAMMOUT,

　　　　　　　　*Plaintiffs-Appellants,*

No. 04-1433

　　　*v.*

CITY OF DEARBORN, a Michigan municipal
corporation,

　　　　　　　　*Defendant-Appellee.*

---

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 03-70235—Lawrence P. Zatkoff, District Judge.

Argued: April 20, 2005

Decided and Filed: August 12, 2005

Before: MARTIN, COOK, and LAY, Circuit Judges.[*]

---

## COUNSEL

**ARGUED:** William A. Wertheimer, Jr., LAW OFFICE OF WILLIAM A. WERTHEIMER, JR.,
Bingham Farms, Michigan, for Appellants. Laurie M. Sabon, Dearborn, Michigan, for Appellee.
**ON BRIEF:** William A. Wertheimer, Jr., LAW OFFICE OF WILLIAM A. WERTHEIMER, JR.,
Bingham Farms, Michigan, Miriam J. Aukerman, Michael J. Steinberg, Kary L. Moss, AMERICAN
CIVIL LIBERTIES UNION FUND OF MICHIGAN, Detroit, Michigan, for Appellants. Laurie M.
Sabon, Debra A. Walling, Dearborn, Michigan, for Appellee.

---

## OPINION

---

　　　DONALD P. LAY, Circuit Judge.　Imad Chammout and the American-Arab Anti-
Discrimination Committee (AAC) challenged the constitutionality of a municipal ordinance that
regulates parades on the city streets and sidewalks of Dearborn, Michigan. The district court granted

---

[*]The Honorable Donald P. Lay, Circuit Judge of the United States Court of Appeals for the Eighth Circuit,
sitting by designation.

1

summary judgment in favor of the city of Dearborn, finding that the Dearborn ordinance did not violate the First Amendment.  We reverse.

## I.  Background

In 1989, the city of Dearborn enacted a Special Events Ordinance (Ordinance) which provides, in pertinent part,

> SECTION 1.  PERMIT REQUIRED.  In order to *properly provide for traffic and crowd control, street and property maintenance and the protection of public health, safety and welfare*, it shall be unlawful to participate in any special event upon *any street, park or public area* of the city of Dearborn unless such activity is granted approval by resolution by the City Council.

> SECTION 2.  DEFINITIONS.  For the purpose of this Ordinance, *the term "special event" shall be deemed to include any walkathon, bikeathon, or jogging group, or other organized group having a common purpose or goal, proceeding along a public street or other public right-of-way* in the City of Dearborn . . . .

> SECTION 5.  APPLICATION PERIOD.  No permit shall be issued for a special event *unless application is made not less than 30 days before the date the special event is sought to be held.*

> SECTION 6. PERMIT APPROVAL. *If the City Council finds that the special event is to be held for a lawful purpose and will not in any manner act so as to breach the peace or unnecessarily interfere with the public use of the streets, sidewalks, parks and public areas,* he [sic] shall grant the permit.  Denials of permits shall be in writing, setting forth the reasons for such denial.  Notice of acceptance or denial shall be given within 10 days of receipt of the application.

>> a.      *Permits may include certain reasonable time, place and manner restrictions as a condition to granting such permit if said restrictions are reasonable and necessary for the protection of the public health, safety and welfare.*

> SECTION 7.  PENALTY.  Any person, firm or corporation violating any of the provisions of this ordinance shall, upon conviction thereof, be subject to a fine not exceeding the sum of $500 or imprisonment for a period not exceeding ninety days or both such fine and imprisonment in the discretion of the court.

Dearborn, Mich., Code §§ 17-26 - 17-32 (2004) (emphasis added).  Although the city of Dearborn has stated that its city council may waive the requirements established in the Ordinance, there is no exception to the thirty-day advance notice requirement contained in the Ordinance itself.

On April 14, 2002, approximately 200 people took part in a march and rally in Dearborn to protest the reported movement of Israeli soldiers into the Jenin Palestinian refugee camp.  At the request of march participants, plaintiff Imad Chammout led the march at its inception.  The march proceeded without a permit, in violation of the Ordinance.

Although Chammout claimed that he did not organize the march and was not aware that it lacked a permit, the day after the march Chammout received a notice to appear for an arraignment.  The offense, listed on his notice, was labeled simply as "protest."  Chammout initially pled guilty to protesting without a permit, but later retained counsel and moved to vacate his plea.  Ultimately,

Chammout agreed to drop his motion to vacate his plea, in exchange for Dearborn's agreement to forego seeking restitution.  Two other men were also prosecuted for participating in the demonstration without a permit.

On January 20, 2003, Chammout and the AAC filed a complaint in federal district court for injunctive and declaratory relief, challenging the constitutionality of the Ordinance.  The U.S. war with Iraq was imminent, and the plaintiffs claimed that the Ordinance would restrict their ability to conduct a protest march after the war began.[1]  The plaintiffs argued that the Ordinance violated the First and Fourteenth Amendments of the United States Constitution, raising a host of arguments.  Specifically, the plaintiffs alleged that:

1.    The Ordinance violates the First Amendment because the thirty-day notice requirement is not narrowly tailored to serve a significant governmental interest.

2.    Because the Ordinance prohibits "any group or organized group having a common purpose or goal" from proceeding on public rights of way, the Ordinance violates the First Amendment on its face because it constitutes an unconstitutional restraint on small-group speech.

3.    The Ordinance violates the First Amendment on its face and as applied because it does not provide ample alternative means for communication.

4.    The Ordinance violates the First Amendment on its face and as applied because it imposes strict liability on any person participating in a permitless march, thus criminalizing potentially protected speech without any scienter requirement.

5.    The Ordinance violates the First Amendment on its face because it lacks narrow, objective, and definitive standards to guide official discretion.

6.    The Ordinance violates the First Amendment on its face and as applied because it discriminates based upon the content of speech and the identity of the speaker.

Both parties moved for summary judgment on all claims.  The district court denied summary judgment to the plaintiffs with respect to all of their claims, and granted summary judgment in favor of the city of Dearborn with respect to all of its claims.  We review the district court's grant and denial of summary judgment de novo.  *Doe v. Claiborne County*, 103 F.3d 495, 505 (6th Cir. 1996).

## II.  Narrow Tailoring

Given the city's significant interest in ensuring the safety of travelers on public rights of way, the Supreme Court long ago recognized that requiring permits for marches or parades proceeding on public rights of way constitutes a legitimate exercise of governmental authority.  *Cox v. New Hampshire*, 312 U.S. 569, 574 (1941).  However, when exercising its legitimate authority,

---

[1] On Tuesday, March 18, 2003, with the U.S. moving closer to hostilities in Iraq, Chammout requested a permit to conduct a march in the event of a U.S. invasion of Iraq.  In his application, Chammout explained that the demonstration would be planned for the first weekend after the beginning of the war: "So [if the war starts] on 3-19-03 then the event will be held 3-22-03 Saturday 2pm-7pm."  The day after Chammout submitted his application, a Dearborn official called Chammout and told him that the city would not approve his permit because any march or rally required thirty days notice.  He informed Chammout, however, that he could hold a rally at Dearborn City Hall without notice.

government officials remain constrained by the dictates of the First Amendment. Time, place, and manner restrictions such as permits schemes "must not be based on the content of the message, must be narrowly tailored to serve a significant governmental interest, and must leave open ample alternatives for communication." *Forsyth County v. Nationalist Movement*, 505 U.S. 123, 130 (1992) (citing *United States v. Grace*, 461 U.S. 171, 177 (1983)). While the government may burden the exercise of First Amendment freedoms to serve its significant interests, it may not burden "substantially more speech than is necessary to further [its goal]." *Ward v. Rock Against Racism*, 491 U.S. 781, 799 (1989).

### A. The Thirty-Day Notice Requirement

Any notice period is a substantial inhibition on speech. "The simple knowledge that one must inform the government of his desire to speak and must fill out appropriate forms and comply with applicable regulations discourages citizens from speaking freely." *N.A.A.C.P. v. City of Richmond*, 743 F.2d 1346, 1355 (9th Cir. 1984). Constitutional concerns are heightened further where, as here, the notice period restricts the public's use of streets and sidewalks for political speech. Streets and sidewalks are "prototypical" examples of public fora, and have immemorially been considered a rightful place for public discourse. *Id.; see Hague v. C.I.O.*, 307 U.S. 496, 515 (1939) ("Wherever the title of streets and parks may rest, they have immemorially been held in trust for the use of the public . . . ."). And just as streets and sidewalks are prototypical examples of public fora, political speech related to current events is the prototypical example of protected speech. *Texas v. Johnson*, 491 U.S. 397, 411 (1989). Because notice provisions have the tendency to stifle our most paradigmatic examples of First Amendment activity, courts must take special care when reviewing the government's justification for its infringement.

The plaintiffs concede that the city of Dearborn has a significant interest in providing for traffic and crowd control, property maintenance, and protection of the public welfare. Dearborn's interest notwithstanding, the plaintiffs contend that the Ordinance's thirty-day notice provision burdens substantially more speech than is necessary, and is not narrowly tailored to serve Dearborn's significant governmental interests. The city of Dearborn argues that the thirty-day notice period is necessary for it to prepare properly for a march or parade on public rights of way, and that in any event, it has provided ample alternative means of communication – the numerous parks of Dearborn and Dearborn City Hall – that effectively lessen the burden on protected speech.

At the outset, we note that the language of the Ordinance admits of no content-based considerations. The Ordinance requires any and all speakers to apply for a permit thirty days in advance of a special event, and limits permissible considerations to crowd and traffic control, public safety, and public welfare. Ordinance, §§ 1, 5, 6. The salient issue presented by the Ordinance is whether the thirty-day notice provision is narrowly tailored to Dearborn's significant interests, not burdening substantially more speech than is necessary.

The plaintiffs have offered the testimony of numerous city officials regarding the thirty-day notice period. Former Dearborn chief of police Ronald Deziel testified that while he was chief, a march in Dearborn could be planned within two days on most occasions, and sometimes within one day. The city of Dearborn's current chief of police, Timothy Strutz, said he believed it took thirty days to prepare for a march, but admitted that preparations could be made in less than thirty days and in fact, could be done in one day. Sergeant Fred Stanton, the current organizer of special events for the city of Dearborn, testified that it would take him one week to two weeks to prepare for a march, depending upon whether in his estimation, overtime hours for police officers would be needed. The only reason the process took thirty days, Stanton testified, was because he must wait a "couple of additional weeks" for city council approval, as the council only convenes twice per month.

Even considering the offered testimony in the light most favorable to the city of Dearborn, it is difficult to characterize the thirty-day notice provision as a necessity.[2] Based on the testimony, the only apparent reason for such an expansive notice period is the fact that the city council only meets twice a month; otherwise, the process could be completed in much less time. *See Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 163 (1969) (Harlan, J., concurring) (warning that applications "must be handled on an expedited basis so that rights of political expression will not be lost in a maze of cumbersome and slow-moving procedures"). Such a substantial inhibition on speech cannot be justified by the city council's failure to respond to requests in a more timely fashion.

Furthermore, the city of Dearborn's past practice under the Ordinance renders it indisputable that the thirty-day notice period is overly expansive.[3] The city of Dearborn submitted a chart identifying seventy-one special events held in Dearborn, from January 2000 to February 2003, that required permits. The majority of the seventy-one special events held in Dearborn were bike rides, parades, swim meets, walks, races, and festivals – events that are commonly planned well in advance. Of the seventy-one special events identified by the city of Dearborn, at least twelve special events have been held on less than thirty days notice, and in only two cases did the participants apply for a permit thirty days in advance. Other evidence in the record, but not included in Dearborn's chart, demonstrates that the Michigan Task Force Palestinian March was granted a permit with only two days of advance notice, while the Arab Forum Protest March was given a permit with only eight days of advance notice. In at least twelve cases, then, the city of Dearborn waived the thirty-day notice provision, accommodated requests for processions on its streets and sidewalks, and apparently did so without incident.

The city points to this practice of granting waivers as a means of saving the Ordinance from a lack of narrow tailoring. That is, it contends that, though the thirty-day notice requirement may suppress some spontaneous speech, its practice of granting waivers accommodates spontaneous demonstrations and thus saves the Ordinance. We find this argument unavailing. Nothing in the Ordinance places permit applicants on notice that the city may waive the thirty-day notice period – indeed, the Ordinance unambiguously provides that "[n]o permit *shall* be issued for a special event unless application is made not less than 30 days before the date the special event is sought to be held." (emphasis added). Furthermore, the city points to no provision in the Ordinance, past practice, or narrowing construction that specifies standards by which it makes its waiver decisions. While we embrace the broad latitude and flexibility extended to waiver schemes generally, *Parks v. Finan*, 385 F.3d 694, 700 (6th Cir. 2004), the city of Dearborn's "unwritten policy of waiving the permit requirement" is "opaque," and lacking in sufficient notice and standards to guide city

---

[2] It is interesting to note that other municipalities require substantially less time to prepare for a march. San Francisco requires twenty-four hours to prepare for a march, while Boston requires three hours of advance notice. *City of Richmond*, 743 F.2d at 1356. A study conducted in 1970 of twenty-two municipalities showed that Denver, Oakland, and Dallas had no advance notice requirements for a march, and only three of the twenty-two municipalities studied had an advance notice requirement of more than six days. According to the study, the average advance notice requirement was New York City's thirty-six-hour requirement. *Id.* at 1356-57 (citing Blasi, *Prior Restraints on Demonstrations*, 68 Mich. L.Rev. 1482, 1526 n.170, 1524 n.161 (1970)).

[3] We also note that in this case, the reasoning which leads to our conclusion that the thirty-day notice provision is not narrowly tailored also leads to the conclusion that the thirty-day notice provision is overbroad. Indeed, the primary reason that the statute lacks narrow tailoring is its overbreadth. *See*, *e.g.*, *City of Richmond*, 743 F.2d at 1357 ("[A]ll available precedent suggests that a 20-day advance notice requirement is overbroad.").

officials, *Church of Am. Knights of KKK v. City of Gary*, 334 F.3d 676, 682 (7th Cir. 2003).  It thus fails to save the Ordinance from its lack of narrow tailoring.[4]

Lastly, the city of Dearborn claims that because it has provided ample alternative means of communication, namely Dearborn City Hall and Dearborn parks, the thirty-day notice period does not pose a substantial burden on free expression.  However, whether the thirty-day notice period is narrowly tailored is a separate question, to be taken on its own.  *Southeastern Promotions, Ltd., v. Conrad*, 420 U.S. 546, 556 (1974).  And because we have already found that the Ordinance is not narrowly tailored, whether the city of Dearborn has provided ample alternatives of communication is now irrelevant in this case; providing ample alternative means of communication will not cure a defective regulation if Dearborn's thirty-day notice provision sweeps too broadly.  *See City of Richmond*, 743 F.2d at 1355 ("[L]aws regulating public fora cannot be held constitutional simply because they leave potential speakers alternative fora for communicating their views.").

Accordingly, the Ordinance's thirty-day notice provision is invalid on its face.[5]

### B.  Small Group Speech

The Ordinance defines a special event as "any walkathon, bikeathon, or jogging group or other organized group having a common purpose or goal, proceeding along a public street or other public right-of-way in the City of Dearborn."  The plaintiffs contend that this provision is breathtaking in its sweep, because virtually any group of two or more persons walking on a public right of way with a common purpose or goal would presumably be required to possess a permit under the Ordinance.  As such, the plaintiffs argue that because the Ordinance applies to small groups, it is overly broad and not narrowly tailored.  We agree.

Permit schemes and advance notice requirements that potentially apply to small groups are nearly always overly broad and lack narrow tailoring.  The Ordinance is overly broad because under the Ordinance as written, any procession of people with a common purpose or goal, whether it be a small group of protestors or a group of senior citizens walking together to religious services, are conceivably required to obtain a permit from the city of Dearborn.  *See Burk v. Augusta-Richmond County*, 365 F.3d 1247, 1259 (11th Cir. 2004) (Barkett, C.J., concurring) (finding public demonstrations striking down an ordinance not narrowly tailored because it applied to "small intimate groups").  There are myriad circumstances in which an organized group travels on a public right of way with a common purpose or goal.  The language of the Ordinance applies the permit requirement to any group of people traveling in such a manner on the public rights of way.

---

[4] The fact that the city of Dearborn regularly allows exemptions to its own requirement provides more support for our conclusion that the Ordinance's thirty-day notice provision is not narrowly tailored to serve a significant governmental interest.  *See Young v. Am. Mini-Theatres, Inc.*, 427 U.S. 50, 67 n.27 (1976) ("If some groups are exempted from a prohibition on parades and pickets, the rationale for regulation is fatally impeached.") (citation omitted); *Congregation Lubavitch v. City of Cincinnati*, 997 F.2d 1160, 1166 (6th Cir. 1993) ("Because the City is so willing to disregard the traffic problems [by making exceptions to the ordinance], we cannot accept the contention that traffic control is a substantial interest.") (citation omitted).

[5] It is more common to consider as-applied challenges to statutes before considering facial challenges, so that courts may decide constitutional issues on the narrowest possible grounds.  However, because of the nature of the plaintiffs' claims in this case – alleging that the Ordinance violates the First Amendment by being overly broad and not narrowly tailored – it is more expedient to address the facial claims exclusively.  Considering the facial claims exclusively is appropriate where, as here, an "attempt to enforce [the Ordinance] would create an unacceptable risk of the suppression of ideas."  *City Council v. Taxpayers for Vincent*, 466 U.S. 789, 797-98 (1984) ("In cases of this character a holding of facial invalidity expresses the conclusion that the statute could never be applied in a valid manner.").

*Grossman v. City of Portland*, 33 F.3d 1200, 1206-07 (9th Cir. 1994). Because the Ordinance would include almost any imaginable procession on Dearborn's streets or sidewalks, the Ordinance, as written, is hopelessly overbroad.

For the same reason, the Ordinance lacks narrow tailoring. The city of Dearborn's significant interest in crowd and traffic control, property maintenance, and protection of the public welfare is not advanced by the application of the Ordinance to small groups. *Burk,* 365 F.3d at 1258-59; *see Grossman*, 33 F.3d at 1207 (stating that "we simply cannot agree that six to eight people carrying signs in a public park constituted enough of a threat to the safety and convenience of park users . . . to justify the restriction imposed on their speech"). In most circumstances, the activity of a few people peaceably using a public right of way for a common purpose or goal does not trigger the city of Dearborn's interest in safety and traffic control.

Accordingly, in addition to the lack of narrow tailoring in its thirty-day notice provision, the Ordinance lacks narrow tailoring on a second score. Because its language applies to small groups, sweeping too broadly and improperly defining the type of public processions which fall within the city's significant interests, Section 2 of the Ordinance is unconstitutional on its face.

### III.  Vagueness

The plaintiffs also contend that various portions of the Ordinance are unconstitutionally vague, both facially and as applied to them. We disagree. A statute is unconstitutionally vague if it denies fair notice of the standard of conduct for which the citizen is to be held accountable, or if it is an unrestricted delegation of power which leaves the definition of its terms to law enforcement officers. *Leonardson v. City of East Lansing*, 896 F.2d 190, 196 (6th Cir. 1990). Government officials are not vested with undue discretion under a licensing scheme, so long as the licensing scheme contains "narrow, objective, and definite standards to guide the licensing authority." *Shuttlesworth*, 394 U.S. at 151.

First, the plaintiffs argue that Section 1 of the Ordinance is unconstitutionally vague because the Ordinance defines "special event" as any "organized group having a common purpose or goal." Although we noted in the previous section that this provision is overly broad and lacks narrow tailoring, it is not unconstitutionally vague. Its deficiency is that it brings too much protected activity within its purview, not that it is unclear about which activities fall within its purview. It is not constitutionally deficient on vagueness grounds.

The term "group" refers to two or more persons. Webster's Collegiate Dictionary 539 (9th ed. 1990). The term "organize" means, *inter alia*, "to arrange or form into a coherent and functioning whole," or "to set up an administrative structure." *Id.* at 831. The term "organized" means "having a formal organization to coordinate and carry out activities." *Id.* Accordingly, an "organized group" under the Ordinance means that two or more persons have created an organization to coordinate and carry out activities. In this case, the activity is a procession on a public right of way with a "common purpose or goal."[6] This language is specific enough,

------

[6] Plaintiffs cite *Cmty. for Creative Non-Violence v. Turner*, 893 F.2d 1387, 1392 (D.C. Cir. 1987), for the proposition that the word "organized" is vague. *Id.* In *Turner*, the ordinance required permits for "the organized exercise of rights and privileges which deal with political, religious, or social matters and are non-commercial." *Id.* In that case, however, the D.C. Circuit was rightfully concerned with the individual exercise of organizational imperatives, like the individual who wears an organizational button on public rights of way. *Id.* In this case, however, the word "organized" is modified by the word "group," thus distinguishing it from *Turner*. *Id.* We also note that in *Turner*, the court assumed that the term "organized" meant two or more persons, and decided that the ordinance at issue was not narrowly tailored. *Id.*

sufficiently describing the type of procession governed by the Ordinance: two or more people who have organized themselves, proceeding on a city sidewalk or street, for a common set of purposes or goals.

In the same section, the Ordinance also gives examples of organized groups with common purposes or goals, such as walkathons, bikeathons, and jogging groups. The inclusion of examples further alleviates vagueness problems, and narrows the discretion of city officials when considering whether a special event is taking place. *See Hotel & Motel Ass'n of Oakland v. City of Oakland*, 344 F.3d 959, 973 (9th Cir. 2003) (stating that examples in an ordinance tend to alleviate vagueness concerns). As a whole and in part, then, the statement "organized group with a common purpose or goal" – although constitutionally deficient on other grounds – does not present vagueness problems.

Second, the Ordinance also provides that so long as a special event is being held "for a lawful purpose and will not in any manner act so as to breach the peace or unnecessarily interfere with the public use of the streets, sidewalks, parks and public areas," the Dearborn city council "shall" grant the permit. Ordinance, § 6. The plaintiffs contend that the phrases "breach the peace" and "unnecessarily interfere" are also unconstitutionally vague.

The term "breach the peace" is not unconstitutionally vague. The term is sufficiently narrowed by the Dearborn Code of Ordinances, which defines the term as "Any person who shall make or assist in making any noise, disturbance, trouble, or improper diversion, or any rout or riot, by which the peace and good order of the city are disturbed." Dearborn, Mich., Code § 14-131 (2004). Similarly, the term "unnecessarily interfere," when taken in context, does not lead to vagueness problems. The Dearborn city council is not being told to deny a permit if it believes that the permit application "unnecessarily interferes" with the city council's conception of what may be an appropriate or inappropriate message. *Cf. Shuttlesworth*, 394 U.S. at 149 (giving the commissioner absolute power to deny a permit to protect "public welfare, peace, safety, health, decency, good order, morals or convenience"). Rather, the Dearborn city council is to deny a permit only when the parade is "for a lawful purpose," but "unnecessarily interferes *with the public use* of the streets, sidewalks, parks and public areas." Ordinance, § 6 (emphasis added). As such, the authority of the city council is narrowly circumscribed to deny permits only in situations where an event is being held for a lawful purpose, but would otherwise interfere with the public's use of public rights of way. *See Thomas v. Chicago Park. Dist.*, 534 U.S. 316, 324 (2002) (finding that an "unreasonable danger to the health or safety" is an objective, reasonably specific criteria). This is a legitimate concern, and is not unconstitutionally vague.

Accordingly, the plaintiffs cannot prevail on their challenge to the language of the Ordinance on vagueness grounds.

## IV.  Strict Liability

The Ordinance states that "it shall be unlawful to participate in any special event without a permit." Ordinance, § 7. Violators are subject to ninety days imprisonment, a $500 fine, or both. *Id.* There is no *mens rea* requirement in the Ordinance – "participation" is all that is required to violate it. Under the Ordinance, then, any person who participates in a permitless march – whether they are aware that no permit has been obtained or otherwise – may be held strictly liable for a criminal offense. The plaintiffs argue that a strict liability regime is inappropriate in the First Amendment context because of its potential to chill the exercise of protected First Amendment activity. The city of Dearborn argues that the strict liability regime of the Ordinance is properly linked to a "public welfare offense," and that it may impose strict liability for such infractions in order to ensure the safety and health of its citizens.

Although disfavored in United States law, strict liability regimes have been deemed appropriate in limited circumstances. Most familiar is the regulation of motor vehicles, commercial goods, or food and drug legislation where the safety and health of the public is of ultimate concern. *Smith v. California*, 361 U.S. 147, 152-53 (1960). These circumstances generally obtain when the prohibited activity "impairs the efficiency of controls deemed essential to the social order as presently constituted." *Morissette v. United States*, 342 U.S. 246, 256 (1952). The violator in such cases "is in a position to prevent [the violation] with . . . no more exertion than [society] might reasonably exact[,]" and the "conviction does no grave damage to an offender's reputation." *Id.*

When a strict liability statute potentially affects First Amendment freedoms, however, it may "have the collateral effect of inhibiting the freedom of expression, by making the individual the more reluctant to exercise it." *Smith*, 361 U.S. at 151. Although the city of Dearborn possesses an undoubted interest in public safety and traffic control, its interest must be "exerted so as not to deny or unwarrantedly abridge the right of assembly and the opportunities for the communication of thought and the discussion of public questions immemorially associated with resort to public places." *Cox*, 312 U.S. at 574. The question in this case, then, is whether the strict liability component of the Ordinance chills the exercise of First Amendment rights.[7] If so, the Ordinance is unconstitutional because "any statute that chills the exercise of First Amendment rights must contain a knowledge element." *Video Software Dealers Ass'n v. Webster*, 968 F.2d 684, 690 (8th Cir. 1992).

In *Smith*, the Supreme Court reversed the conviction of a bookstore owner who was held strictly liable for possession of obscene books. *See Smith*, 361 U.S. at 152. Although obscene materials are afforded no protection under the First Amendment, the Court found that the absence of a scienter requirement in regulating obscene materials would chill the dissemination of non-obscene, constitutionally protected materials. *Id.* Like the city of Dearborn's current argument, the city in *Smith* analogized its regulation of booksellers to traditional penal statutes for the public welfare, such as food and drug regulations, under which a distributor could be held strictly liable. The Court stated:

> We find the analogy instructive . . . . There is no specific constitutional inhibition against making the distributors of good[s] the strictest censors of their merchandise, but the constitutional guarantees of the freedom of speech and of the press stand in the way of imposing a similar requirement on the bookseller. By dispensing with any requirement of knowledge of the contents of the book on the part of the seller, the ordinance tends to impose a severe limitation on the public's access to constitutionally protected matter.

*Id.* at 152-53. Like the ordinance in *Smith*, we believe that the Ordinance in this case chills constitutionally protected speech.

Our analysis is guided by the fact that parades and processions are a unique and cherished form of political expression, serving as a symbol of our democratic tradition. There is scarcely a more powerful form of expression than the political march. Unlike stationary demonstrations or

---

[7] We note that in commercial speech cases, the Supreme Court has held that the usual concern of chilling protected speech "applies weakly, if at all, in the ordinary commercial context." *Bates v. State Bar of Arizona*, 433 U.S. 350, 380 (1977). Strict liability regimes regulating commercial speech have thus been approved because "the economic motivations that inspire advertising neutralize the fear that protected speech will be chilled." *Accounting Outsourcing, L.L.C. v. Verizon Wireless Pers. Comm., L.P.*, 329 F.Supp. 2d 789, 812 (M.D. La. 2004); *see also Lavey v. City of Two Rivers*, 171 F.3d 1110, 1117 (7th Cir. 1999) (stating that the analogy between *Smith* and strict liability in the commercial context "limps").

other forms of pure speech, the political march is capable of reaching and mobilizing the larger community of citizens. It is intended to provoke emotive and spontaneous action, and this is where its virtue lies. As it progresses, it may stir the sentiments and sympathies of those it passes, causing fellow citizens to join in the procession as a statement of solidarity. Automatically criminalizing participation in a permitless march destroys the spontaneity and enthusiasm which public demonstrations of this nature are meant to engender. And by placing an unnecessary obstacle before the marchers' access to the public streets and sidewalks, the Ordinance chills a substantial amount of speech related to current events. Yet speech related to current events is the type of speech which is "situated at the core of our First Amendment values." *Johnson*, 491 U.S. at 411.

Under the Ordinance, any person who unknowingly participates in a permitless march may be arrested, fined up to $500, placed in jail for ninety days, or both. More importantly, the Ordinance places the onus upon every participant to be aware of whether the march has a permit, and would hold any participant liable for its violation, even in cases where the participant was mistakenly advised that a permit was issued. A good-faith belief is no excuse, and thus the potential protestor cannot rely upon the assurances of participants in the march. Rather, the potential protestor would be well-advised to seek personal verification from a city official that the demonstration has been authorized, or run the risk of being thrown in jail. Requiring potential march participants to seek authorization from city officials before joining a public procession or risk being jailed is antithetical to our traditions, and constitutes a burden on free expression that is more than the First Amendment can bear.

In making this ruling, we remain aware of the city's significant interest in crowd control, traffic control, and public safety. The city of Dearborn, as any other city, has a host of laws dealing with disturbances on public rights of way at its disposal – breach of the peace, disorderly conduct, or laws penalizing non-cooperation with official commands – to protect the public safety and welfare.

We also note that other cities of various sizes are able to effectively regulate parades and processions without resorting to a strict liability regime.[8] The city of Chicago subjects violators of its parade ordinance up to a maximum of ten days of incarceration and up to $1,000 in fines, but only if the person "knowingly" violates the various provisions of the ordinance. Chicago, Ill., Code Tit. 10, art. III, ch. 10, § 8-330 (t) (2001). Madison, Wisconsin, Des Moines, Iowa, Billings, Montana, and Minot, North Dakota also impose fines and/or time in jail based on "knowing" violations of their parade ordinances. Madison, Wi., Code ch. 10.056, § 12(d), (e) (2004); Des Moines, Ia., Code ch. 102, art. XVII, § 102-1180(4), (5) (2005); Billings, Mt., Code ch. 24, art. 24-500, div. 1, § 24-502 (2005); Minot, N.D., Code ch. 28, art. VI, § 28-127 (2005). Kansas City, Missouri, Minneapolis, Minnesota, and Scottsdale, Arizona, make no mention of penalties in their parade ordinances, presumably because ancillary laws dealing with disturbances on public rights of way remain in effect. Kansas City, Mo., Code art. IV, ch. 70, § 263 (1994); Minneapolis, Mn., Code Tit. 17, ch. 447 (2005); Scottsdale, Az., Code ch. 17, art. IV, § 17-136 – 137 (2005). Other cities such as Omaha, Nebraska, exempt spontaneous political demonstrations entirely from their parade ordinances.[9] Omaha, Ne., Code ch. 20, art. IX, § 20-293(d) (2005). Still other cities, such as Charlotte, North Carolina, and Houston, Texas, explicitly state in their parade ordinances that participants remain subject to all applicable laws, with no mention of specific penalties in the

---

[8] Of course, the use of the following examples is not meant to pass upon the constitutionality of the ordinances cited.

[9] Although the Omaha ordinance makes no mention of penalties for spontaneous political demonstrations, it is likely that applicable state laws governing conduct on public rights of way apply.

ordinances. Charlotte, N.C., Code part 2, ch. 19, art. XI, § 19-303(g), 19-313(c) (2004); Houston, Tx., Code ch. 45, art. IX, § 45-32 (2005). Although this is by no means an exhaustive sampling, these ordinances demonstrate that the city of Dearborn can draft an ordinance that is more attuned to the First Amendment rights of its citizens.

Accordingly, we hold that the Ordinance, on its face, violates the First Amendment by holding participants in a march along public rights of way strictly liable if the march proceeds without a permit.

### V. The City of Dearborn's Narrowing Construction

Responding to the plaintiffs' claim that the Ordinance impermissibly reaches small group speech, the city of Dearborn offered a narrowing construction of the Ordinance, which the district court accepted.[10] According to the city of Dearborn, an event only becomes a "special event" under the Ordinance, thus requiring a permit, when two things happen. First, an organized group having a common purpose or goal proceeds along a public street or public right of way. Second, the procession on the public right of way is such that it requires services from the city of Dearborn that are above and beyond the normal services allotted by the city for traffic control, crowding, street and property maintenance, and the protection of public health, safety, and welfare. Because small groups would presumably not require additional city services, the district court found that the city of Dearborn's narrowing construction eliminated concerns that the Ordinance infringes upon small group speech. The plaintiffs argue, however, that the narrowing construction does not alleviate the Ordinance's vagueness problems, and raises the threat of content-based classifications by city officials.

A federal court may choose to adopt a narrowing construction if that construction is both "reasonable" and "readily apparent." *Stenberg v. Carhart*, 530 U.S. 914, 944 (2000). Surprisingly in this case, the narrowing construction offered by the city of Dearborn fails to alleviate any of the defects in the Ordinance, and is in fact more constitutionally suspect than the Ordinance without the narrowing construction.

The narrowing construction creates two vagueness problems which would otherwise not exist. As has been noted, the narrowing construction would require a permit for a parade or procession if the event required additional city services to properly provide for traffic and crowd control. However, nowhere in the Ordinance does it state the circumstances under which a parade or procession requires additional city services. A group of two or three protesters advocating an unpopular message may provoke the ire of the citizens they pass, perhaps requiring Dearborn police officers to control an unruly crowd of hecklers. Because their protest required the use of additional city services, the narrowing construction would require a permit. Yet a larger group of people, say of ten or fifteen people advocating a popular message, may not require additional city services because of the popularity of their cause. The Ordinance, as understood with the narrowing construction, is thus unconstitutionally vague because it offers no guidance to citizens regarding when they would be required to apply for a permit. Not only does the narrowing construction fail to remedy the problem it intended to address – its potential application to small groups – but it also

---

[10] The city of Dearborn also claimed that the city's parks were exempted from the Ordinance, and thus a rally held in a park would not require a permit. However, this contention contradicts the plain language of the Ordinance, which explicitly states that a permit is required for "any special event upon any street, park, or public area of the City." Ordinance, § 1. The city's arguments notwithstanding, we are not prepared to accept a narrowing construction that exempts a word from the Ordinance which is explicitly included in the Ordinance. *See City of Richmond*, 743 F.2d at 1358 (refusing to adopt an offered narrowing construction because it "tortures the plain language of the Richmond Ordinance").

fails at its primary function: providing proper notice to citizens of how to conform their conduct to the Ordinance.

This raises the narrowing construction's second problem: unbridled discretion on the part of Dearborn city officials, and the threat of content-based discrimination. Because a citizen planning a march cannot know whether the march will require additional city services, the decision whether a march requires a permit is left to Dearborn city officials. As Sergeant Stanton testified, when determining the need for police resources, he "do[es] some research there as to what the message is being sent and would it be offensive to other people where they would counter-protest." Under certain circumstances, then, an unpopular march will require a notice period and approval, while a popular march of the same size would not require a notice period or approval. More importantly, under the narrowing construction, it is the content of the message, and the response of other citizens to the message's content, that will determine whether or not a notice period and approval by the city council is needed. *See Church of the Am. Knights of the K.K.K. v. City of Gary,* 334 F.3d 676, 680-81 (7th Cir. 2003) ("To allow denial on such a ground would be to authorize a 'heckler's veto.' It follows pretty directly that a city cannot in lieu of denying the permit charge the applicant for the expense to the city of reining in the hecklers."). The narrowing construction thus poses severe vagueness problems, which in turn lead to the real threat of content-based considerations under Dearborn's permit scheme. *See Forsyth County*, 505 U.S. at 134.

Because the offered narrowing construction leads to severe First Amendment deficiencies, we decline the invitation to accept Dearborn's narrowing construction.

## VI. Conclusion

The city of Dearborn's Ordinance suffers from a number of constitutional infirmities. A more carefully crafted ordinance that strikes the proper balance between the city's significant interests and the exercise of First Amendment freedoms is needed. The record demonstrates that in practice, the city of Dearborn rarely denies a waiver of the thirty-day notice requirement, and often accommodates spontaneous demonstrations for a variety of causes. A closer correspondence between the Ordinance and the city of Dearborn's tendencies and capabilities is appropriate.

Although we affirm the district court's ruling that Section 2 and Section 6 of the Ordinance are not void for vagueness, we reverse the ruling of the district court in all other respects because (1) The thirty-day notice provision of the Ordinance is not narrowly tailored; (2) The application of Section 2 of the Ordinance to small group speech is both overbroad and not narrowly tailored; and (3) Section 7 of the Ordinance unconstitutionally infringes upon protected First Amendment activity by imposing strict liability. We also reverse the district court's acceptance of the city of Dearborn's narrowing construction because it leads to more severe vagueness problems than the Ordinance without the narrowing construction, presenting a real threat of content-based discrimination.