IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
April 17, 2012 Session

# CITY OF MARYVILLE, TENNESSEE v. WALLACE SCOTT LANGFORD

**Appeal from the Circuit Court for Blount County**
**No. L16773     David R. Duggan, Judge**

---

**No. E2011-01326-COA-R3-CV-FILED-JUNE 19, 2012**

---

This appeal arises from a dispute over the constitutionality of City of Maryville ("Maryville") ordinance 16-110 ("the Ordinance"). The Ordinance requires the issuance of a permit for certain public meetings and parades in Maryville. Wallace Scott Langford ("Langford") and two associates engaged in street preaching at a Maryville intersection. Langford declined to apply for a permit and was cited for violating the Ordinance. After a default judgment was rendered against him in municipal court, Langford appealed to the Circuit Court for Blount County ("the Trial Court"). Langford challenged the constitutionality of the Ordinance on grounds that it is overly broad and vague. Following a hearing, the Trial Court entered an order upholding the constitutionality of the Ordinance. Langford appeals. We hold that the Ordinance is unconstitutional on its face as it is vague, overly broad, and affords too much discretion to the officials charged with issuing permits. We reverse the judgment of the Trial Court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Reversed;**
**Case Remanded**

D. MICHAEL SWINEY, J., delivered the opinion of the Court, in which HERSCHEL P. FRANKS, P.J., and CHARLES D. SUSANO, JR., J., joined.

William L. Gribble, II, Maryville, Tennessee, for the appellant, Wallace Scott Langford.

Matthew C. Haralson and Melanie E. Davis, Maryville, Tennessee, for the appellee, the City of Maryville.

# OPINION

## Background

The facts of this case are not in dispute. In November 2008, Langford was cited for violating the Ordinance. Langford declined to defend himself in municipal court and so the municipal court entered a default judgment against him. Langford sought declaratory judgment in the Trial Court, arguing that the Ordinance was unconstitutional as it allegedly is overly broad and impermissibly vague.

Both parties on appeal rely on the Trial Court's findings of fact[1], which state:

The subject Maryville ordinance is found at Maryville Municipal Code Title 16, §16-110, which provides as follows:

> **16-110. Parades regulated.** It shall be unlawful for any club, organization, or similar group to hold any meeting, parade, demonstration, or exhibition on the public streets without some responsible representative first securing a permit from the chief of police, or his designee. Application for a permit shall be made not less than one (1) week prior to the time planned for such parade or assembly, giving the time of day the same [is] to begin, the probable number of participants, the purpose for which the parade or assembly is to be held, and the place or route of the parade or assembly. No permit shall be issued by the recorder unless such activity will not unreasonably interfere with traffic and unless such representative[] shall agree to see to the immediate cleaning up of all litter which shall be left on the streets as a result of the activity. Furthermore, it shall be unlawful for any person obtaining such [a] permit to fail to carry out his agreement to immediately clean up the resulting litter.

On November 22, 2008, a citation was issued to Defendant for violation of that ordinance when Defendant, along with three other individuals, were found to be engaging in street-preaching at the intersection of Highway 321 and Broadway in Maryville. Defendant, and the others, were engaged in that activity and had not obtained a permit for the activity. Defendant was present that day for the purpose of proselytizing and preaching. Defendant was

---

[1]The record does not contain either a transcript or statement of the evidence.

accompanied by his minor daughter, who was not preaching; his adult step-son, who was preaching; and his step-son's adult friend, who was preaching. Defendant, and his three companions, lived in Dover, Tennessee at the time. Defendant and his adult step-son are members of the Street Preachers Fellowship.

The three persons who were engaged in street preaching, including Defendant, were preaching at the intersection of Highway 321 and Broadway in Maryville as that intersection is shown in Ex. 1. Defendant was standing on the corner of the property where the Maryville Municipal Building is located, as indicated by the letter "L" on Ex. 1, but the other two adults were standing in the median as indicated by the two "X" marks as shown on Ex. 1. The video of the incident, before the Court as Ex. 2, reveals that the three adult street preachers, including Defendant, were screaming and shouting at passing motorists, and that they were also screaming and shouting at the police officers after they arrived on the scene. The video also establishes that they were holding signs, and that, at times, the two adults other than Defendant were passing back and forth through the crosswalk to and from the median.

The officers explained the need for a permit and the process for obtaining a permit, and it was determined that Defendant, and the others, did not have a permit. The officers gave Defendant, and the others, the opportunity to leave peacefully. Defendant and the others did not leave. Defendant insisted that he did not need a permit, and that the [C]onstitution is his permit. Ultimately the officer informed Defendant, and the others, that a citation would be issued for failure to obtain the permit, and that if they did not leave after the issuance of the citation, they would be arrested for disorderly conduct. The intersection in question is a busy intersection, including on the day and at the time of the incident. The citation was issued at 4:05 p.m. on November 22, 2008. It is undisputed that no permit was issued for the group to engage in street preaching.

Maryville Police captain David Graves testified that the ordinance requires the application for a permit if any group or club is engaged in any type of demonstration. Graves further testified that part of his job duties includes consideration of the applications for such permits, and the issuance of those permits. He stated that he does not delegate that duty but rather handles it personally, and that the only time anyone else deals with the issuance of permits is when he is out of town, and he said that has only happened two or three times in recent years. Defendant did not make application for or obtain

a permit. The application for such permits, as well as the issuance of those permits, pursuant to the ordinance does not involve any cost. The permits are free. Graves testified that the City's most important concern in requiring permits is to assure the safety of individuals involved in the assembly and any persons around such persons. Graves testified that his only concern, in deciding whether or not to issue a permit, is whether it involves a major intersection where there is a history of a large number of automobile crashes. Graves testified that the particular intersection at issue–Highway 321 and Broadway–is a major intersection in the city and is the site of the second largest number of crashes in the city. There have been numerous lawsuits over automobile crashes at the intersection, including lawsuits pertaining to the City's responsibility for properly maintaining the intersection. Graves testified that the intersection is a dangerous intersection.

Graves testified that he has no discretion to deny a permit based on the subject matter content of the meeting, parade, demonstration, or exhibition. He further testified that he had never denied a permit based on subject matter content. While no policy or standard operating procedure was offered into evidence, Graves testified that there are standards which restrict his discretion existing by order of the chief of police and contained in Maryville Police Department policy and standard operating procedures. Graves further testified that if there are safety concerns with respect to a particular application, he does not just deny the issuance of the permit, but rather works with the club, organization or group to find another, safer location. He testified that if no agreement could be reached, he *would* deny issuance of the permit, but that such has never happened.

Graves testified that had Defendant, and the others in his group, sought a permit for street preaching at this particular busy, dangerous intersection, he would have required the group to move to another site away from the intersection, but that the demonstration would have been allowed in a highly visible area along either Broadway or Highway 321. He testified that any decisions which he would have made in issuing the permit would have been based solely upon issues pertaining to the safety of the persons, vehicles or pedestrians involved in the activity.

Graves testified that he had issued a permit for street preaching in the previous week, though not for that particular intersection. Graves testified that he treats everyone the same in terms of safeguards and protection. Graves testified, for example, that the Right to Life group is always allowed to engage

-4-

in a Chain of Life demonstration on Highway 321, but they are required to stay out of any intersection and are located in an area on the highway between intersections. In 2010, 60 permits were issued. In 2009, 130 permits were issued. In 2008, 110 permits were issued.

In the past three years, only three permits have been denied. One of those denials was for a one-day event on East Broadway where music was to be played in front of a business establishment. No dangerous intersection was involved. While the permit was not issued because it was sought the day before the event, the applicant was told that he could engage in the activity, and if there were no complaints he would be allowed to continue. The second denial was for an event involving off-road vehicles on city property in the Big Springs Industrial Park. The application was denied due to a history of vandalism, littering, and injury and resultant litigation involving the use of all-terrain vehicles in that area. The third denial was for a demonstration that was to take place in front of the courthouse. The applicant had threatened an acting judge and was denied the permit. She was asked to move her activity to another location, and she was provided with several locations where she could engage in her demonstration. Graves testified that no permit would be required for one person, but that the Maryville Police Department would want to know of the activity for safety issues. He testified that a permit would be required for any club, organization or similar group consisting of two or more persons.

(citations omitted and paragraph structure reformatted)

The Trial Court rendered its conclusions of law in its November 2011[2] order. The Trial Court, in upholding the Ordinance as constitutional, held, *inter alia*: 1) the Ordinance was not unconstitutionally vague; 2) the Ordinance did not vest too much discretion in the hands of its issuer; 3) the Ordinance was narrowly tailored; and, 4) the one-week notice requirement in the Ordinance did not render the Ordinance overly broad. Regarding vagueness, the Trial Court stated, in part:

In the present case, the ordinance is not unconstitutionally vague. This

---

[2]The Trial Court originally entered an order in this case in May 2011. Maryville filed a motion to stay in this Court, arguing that the May 2011 order did not constitute a final, appealable order. We granted Maryville's motion and stayed the appeal so that the parties could obtain a final order. The Trial Court entered a final order in November 2011. This November 2011 order, which is the Trial Court's final order in this case, subsequently was transmitted to this Court in keeping with our Order.

Court will not strain to read ambiguity into the terms of this ordinance when those terms are commonly understood. *Webster's New World Dictionary* defines "club" as "a group of people associated for a common purpose"; "organization" as "any organized group, as a club"; "group" as "a number of persons or things gathered or classified together"; "meeting" as "a coming together" or "a gathering of people"; "parade" as "any organized procession or march, as for display" or "to march or walk through, as for display"; "demonstration" as a showing of "feelings or views publicly by meetings, etc."; and "exhibition" as a "public showing..."

In dealing with the issue of vagueness, the Sixth Circuit, in *City of Dearborn*, held that a statute, or in this case an ordinance, must provide fair notice of the standard of conduct for which the citizen is to be held accountable. The ordinance at issue in this case provides that type of notice. The citizen is clearly advised that if he wishes to engage in, for example, a demonstration on the public streets, then the permit shall be sought and the relevant information provided in the application.

Regarding narrow tailoring, the Trial Court held, in part:

The parties have stipulated in this proceeding, and it is not at issue, that the subject ordinance is content-neutral. The only proof before this Court is that the ordinance is applied without discrimination, and that Defendant would have been issued a permit had he simply applied, though likely upon conditions or changes in time, place and manner as to avoid disturbance of the use of the streets. No doubt the City of Maryville would have required Defendant, and the others, to move away from the dangerous intersection, but nevertheless to a highly visible place along the sidewalk either along Broadway or along Highway 321.

This finding is more than supported by the evidentiary record. Capt. Graves testified to each of the following points: (1) The City of Maryville has never denied a permit based on subject matter content; (2) he has no discretion to deny a permit based on subject matter content; (3) if a permit is sought and the city has street safety concerns, they work to find another location, and there has never been an instance of failing to find a suitable location that allows the applicant free rein to express his or its First Amendment rights; (4) that in just the previous week before the hearing, such a permit had been issued to a street preacher, and likewise the City always grants a permit to the Right to Life group for its Chain of Life demonstration along Highway 321, with the only

restriction being that they are required to be on a sidewalk away from an intersection.

Indeed, in this case this Court cannot conclude even that there are no criteria governing the granting of permits. While there may be no criteria stated on the face of the ordinance, Capt. Graves testified, and the proof is unrebutted, that the policies and procedures to which he testified exist by order of the chief of police and are continued in policy and standard operating procedures. While those policies and standard operating procedures were not offered into evidence, Capt. Graves testified to those procedures, the Court finds him to be a highly credible witness, and no proof was offered by Defendant at the hearing other than his stipulated testimony which does not, in any way, put at issue the witness's credible testimony that there are policies and procedures that govern the issuance, in a fair and non-discriminatory manner, of the required permits.

***

Recognizing that the Sixth Circuit has held that the application of a permit process to a small group requires that special care be applied to such an ordinance in determining it is narrowly tailored to serve a significant government interest, the Court does not find the subject ordinance, however, to be so broadly written as to extend to any two persons walking together along a public street on their way to a church service or for any other purpose. Rather, the present ordinance applies only to meetings, parades, demonstrations or exhibitions on the public streets. Furthermore, the wording of the ordinance, especially when taken in light of the evidence pertaining to how this ordinance is applied, establishes that the issuance of a permit is virtually certain provided that there will be no unreasonable interference with traffic, and that any litter is picked up, and furthermore that even if there is a potential interference with traffic or other concern pertaining to the safety of the public streets and sidewalks, a safe and highly visible location will be found for the meeting, parade, demonstration or exhibition to take place.

Indeed, the Court finds that the only language in the subject ordinance that raises an issue as to the narrow tailoring of this ordinance is the requirement that the permit be applied for one (1) week prior to the event. While Defendant has made a passing reference to this requirement, Defendant has not chosen to attack the ordinance on this basis. Nevertheless, the Court wishes to address this matter and finds that while it would perhaps be better for

the City of Maryville to require a lesser time for the application to be made, the Court cannot find that the one-week requirement renders the ordinance overly broad. There is a large body of case law, including the *City of Dearborn* case, that has stricken 28- and 30-day notice provisions, or application provisions, in such ordinances. There is dictum in many of these cases pointing out that most such ordinances require less than a week, and even that the average for such application provisions is a three-day advance application period. This Court cannot find, however, that a one-week provision, in and of itself, renders this ordinance overly broad and unconstitutional.

Accordingly, it is ORDERED, ADJUDGED AND DECREED that City of Maryville Ordinance 16-110 is a valid time, place and manner restriction and, accordingly, constitutional. The Court finds that Defendant violated § 16-110 of the Maryville Municipal Code. Accordingly, this matter shall be remanded to the Maryville Municipal Court for further proceedings in accordance with this Order.

Langford appeals.

## Discussion

We restate the issues on appeal as follows: 1) whether the Trial Court erred in failing to hold that the Ordinance is not narrowly tailored; and, 2) whether the Trial Court erred in failing to hold that the Ordinance is impermissibly vague.

Initially, we observe that this case involves a facial challenge to the Ordinance. Facial challenges carry a steep burden. The United States Supreme Court has stated that success in a facial attack requires a showing that the law in question is invalid under all circumstances. *United States v. Salerno*, 481 U.S. 739, 745, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987). In certain First Amendment matters, the United States Supreme Court has recognized another type of facial attack whereby the law is invalid on overbreadth grounds if the overbreadth is "substantial" as compared to its "plainly legitimate sweep." *Broadrick v. Oklahoma*, 413 U.S. 601, 615, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973). Application of the overbreadth doctrine has been described as "strong medicine." *Id.* at 613, 93 S.Ct. 2908.

This appeal tasks us with evaluating the constitutionality of a parade ordinance, thus implicating freedom of expression.[3] "[A] regulation of the time, place, or manner of

_____

[3]Langford initially argued in terms of both the United States and Tennessee Constitutions. On
(continued...)

-8-

protected speech must be narrowly tailored to serve the government's legitimate, content-neutral interests but that it need not be the least restrictive or least intrusive means of doing so." *Ward v. Rock Against Racism*, 491 U.S. 781, 798, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989). In keeping with this standard, "[g]overnment may not regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals." *Id*. at 799, 109 S.Ct. 2746. Nevertheless, it has been recognized that "[t]he authority of a municipality to impose regulations . . . to assure the safety and convenience of the people in the use of public highways has never been regarded as inconsistent with civil liberties but rather as one of the means of safeguarding the good order upon which they ultimately depend." *Cox v. New Hampshire*, 312 U.S. 569, 574, 61 S.Ct. 762, 85 L.Ed. 1049 (1941).

The United States Supreme Court has stated:

> [O]ur decisions have also made clear that picketing and parading may nonetheless constitute methods of expression, entitled to First Amendment protection. *Cox v. Louisiana*, *supra*; *Edwards v. South Carolina*, 372 U.S. 229, 83 S.Ct. 680, 9 L.Ed.2d 697; *Thornhill v. Alabama*, 310 U.S. 88, 60 S.Ct. 736, 84 L.Ed. 1093. 'Whenever the title of streets and parks may rest, they have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions. Such use of the streets and public places has, from ancient times, been a part of the privileges, immunities, rights, and liberties of citizens. The privilege of a citizen of the United States to use the streets and parks for communication of views on national questions may be regulated in the interest of all; it is not absolute, but relative, and must be exercised in subordination to the general comfort and convenience, and in consonance with peace and good order; but it must not, in the guise of regulation, be abridged or denied.' *Hague v. C.I.O.*, 307 U.S. 496, 515-516, 59 S.Ct. 954, 964, 83 L.Ed. 1423 (opinion of Mr. Justice Roberts, joined by Mr. Justice Black).

*Shuttlesworth v. City of Birmingham, Ala.*, 394 U.S. 147, 152, 89 S.Ct. 935, 22 L.Ed.2d 162 (1969).

"[E]ven content-neutral time, place, and manner restrictions can be applied in such a manner as to stifle free expression." *Thomas v. Chicago Park Dist.*, 534 U.S. 316,

---

[3](...continued)
appeal, Langford has based his arguments on federal constitutional law.

323, 122 S.Ct. 775, 151 L.Ed.2d 783 (2002). Therefore, the United States Supreme Court has required that "a time, place, and manner regulation contain adequate standards to guide the official's decision and render it subject to effective judicial review." *Id*. "[A]ny permit scheme controlling the time, place, and manner of speech must not be based on the content of the message, must be narrowly tailored to serve a significant governmental interest, and must leave open ample alternatives for communication." *Forsyth County, Ga. v. Nationalist Movement*, 505 U.S. 123, 130, 112 S.Ct. 2395, 120 L.Ed.2d 101 (1992). Both parties agree that the Ordinance at issue is content-neutral.

We first address whether the Trial Court erred in failing to hold that the Ordinance was not narrowly tailored. As argued by Langford, there are two overarching tailoring flaws in the Ordinance: 1) the lack of a small group exception; and, 2) excessive discretion afforded to the issuer of the permit. The case of *American-Arab Anti-Discrimination Committee v. City of Dearborn*, 418 F.3d 600 (6th Cir. 2005) is addressed by both parties, and an analysis of its reasoning was a central feature of the Trial Court's conclusions of law in the instant case. The United States District Court for Michigan, Western District, has concisely summarized *City of Dearborn* with regard to its holding on narrow tailoring issues:

> As the Sixth Circuit has held, "[p]ermit schemes and advance notice requirements that potentially apply to small groups are nearly always overly broad and lack narrow tailoring." *American-Arab Anti-Discrimination Comm. v. City of Dearborn*, 418 F.3d 600, 608 (6th Cir. 2005) (citing *Burk v. Augusta-Richmond Cty.*, 365 F.3d 1247, 1259 (11th Cir. 2004) (Barkett, C.J., concurring) (striking down an ordinance as not narrowly tailored because it applied to "small intimate groups"); *Grossman v. City of Portland*, 33 F.3d 1200, 1206-07 (9th Cir. 1994) (striking permitting ordinance where it was applied to a group of six or eight people carrying signs in a public park). The Sixth Circuit struck as not narrowly tailored and as overbroad an ordinance requiring a permit for any "organized group having a common purpose or goal, proceeding along a public street or other public right-of-way in the City of Dearborn." *American-Arab Anti-Discrimination Comm.*, 418 F.3d at 608. The court concluded that such an ordinance was "hopelessly overbroad" because it "would include almost any imaginable procession on Dearborn's streets or sidewalks ...." *Id*.

***

> In addition, in *American-Arab Anti-Discrimination Comm.*, the Sixth Circuit squarely held that a 30-day notice period for issuance of a permit is not,

on its face, narrowly tailored. *American-Arab Anti-Discrimination Comm.*, 418 F.3d at 607. As the court recognized, the notice period restricts the public's use of traditional public fora that "have immemorially been considered a rightful place for public discourse." *Id*. at 605 (citing *Hague v. CIO*, 307 U.S. 496, 515, 59 S.Ct. 954, 83 L.Ed. 1423 (1939) ("Wherever the title of streets and parks may rest, they have immemorially been held in trust for the use of the public ....")). "Because notice provisions have the tendency to stifle our most paradigmatic examples of First Amendment activity, courts must take special care when reviewing the government's justification for its infringement." *Id*. As a consequence, a court must consider whether a notice provision is unnecessarily protracted, thereby stifling substantially more speech than necessary. *Id*.

*World Wide Street Preachers' Fellowship v. City of Grand Rapids*, 2007 WL 1462130, at \*5 (W.D. Mich. May 16, 2007).

Langford argues that the Ordinance is overly broad because it lacks an exception for small groups. We agree. The Ordinance requires a responsible representative of "any club, organization, or similar group" to obtain a permit from the chief of police or his designee before holding any "meeting, parade, demonstration, or exhibition on the public streets." The Trial Court held that this list made it sufficiently clear that the Ordinance could not be applied to two people walking along a street to, for example, a church service. However, we believe that the language of the Ordinance is, in fact, broad enough to encompass such scenarios. There is no explicit small group exception in the text of the Ordinance, and the terms of the Ordinance may fairly be read to include a sweeping amount of human behavior for which no permit need be sought. "Permit schemes and advance notice requirements that potentially apply to small groups are *nearly always* overly broad and lack narrow tailoring." *City of Dearborn*, 418 F.3d at 608 (emphasis added). The Ordinance potentially applies to small groups, such as the group of three here, and we see nothing in the Ordinance that effectively serves to nullify this defect.

Maryville argues on this point that since the penalty for violating the Ordinance, a fine not to exceed $50[4], is relatively slight, then the Ordinance is not an undue restriction on speech. Conversely, Maryville suggests that more serious criminal penalties would render the outcome different.

---

[4]Maryville represents that the maximum penalty for violating the Ordinance is $50.00 plus court costs. However, Maryville does not cite to the record in support of this assertion. Nevertheless, we will rely on Maryville's representation.

However, having reviewed the authorities on this matter, we are not aware of any controlling law or precedent that establishes this distinction.[5] Barring any authority directing us otherwise, we are unwilling to hold that the government may curtail one's freedom of expression with a relatively small penalty but not a harsh penalty. Either the restriction is valid or it is not. In any event, a $50 fine could well be significant to many people wishing to engage in constitutionally protected activities. Adoption of Maryville's position would mean that those individuals who can afford to pay the penalty will be able to exercise their constitutionally protected rights but those individuals to whom the penalty is significant will have their free exercise of their constitutionally protected rights curtailed. There is no economic sliding scale for the right to engage in constitutionally protected activities. The richest and the poorest among us, as well as all those individuals in-between, all have the same rights under our Constitution. We hold that, as the Ordinance could apply to virtually any pair or group of people engaged in a common activity, the Ordinance is overly broad.

Langford also argues that the Ordinance vests excessive discretion in the issuer of the permit. We agree. The Ordinance provides: "No permit shall be issued by the recorder unless such activity will not unreasonably interfere with traffic and unless such representative shall agree to see to the immediate cleaning up of all litter which shall be left on the streets as a result of the activity." We fail to see how this properly guides the issuer to decide when to issue a permit. The Ordinance merely lists two conditions in which a permit may not be issued. The Ordinance fails to direct when one is to issue a permit.

Langford points to an opinion of the United States District Court for Tennessee, Middle District, which stated with respect to discretion:

> The Charitable Solicitations Ordinance may also be unconstitutional as much for what it does not say as for what it does say. Even if the provisions that the Court has described as likely granting an overly broad discretion of authority were excised, the ordinance must still "contain adequate standards to guide the official's decision and render it subject to effective judicial review." *Thomas*, 534 U.S. at 323, 122 S.Ct. at 780. The Charitable Solicitations Ordinance, however, neither requires the Board to issue a permit if certain prerequisites are met, nor does it mandate denial of a permit if certain

---

[5]Maryville invokes the case of *Bowman v. White*, 444 F.3d 967 (C. A. 8, 2006), in which the United States Court of Appeals, Eight Circuit, upheld a University of Arkansas permit requirement applied to a single individual. Maryville notes the regulation contained no possibility of arrest or imprisonment. However, in addition to not being controlling, we find *Bowman* inapposite. That case concerned a University setting; the instant appeal is about streets, traditionally among the most public and accessible of fora.

circumstances are present. The ordinance merely lists five factors (one of them being the aforementioned "character" and "integrity" factor) for the Board to "consider." How the Board weighs the factors appears to be entirely within the Board's discretion. In addition, the Board appears free to consider unlisted factors, and what those factors are in any given case appear to be, again, entirely up to the Board. For all of these reasons, the Court finds that Plaintiff is likely to succeed in its argument that the Charitable Solicitations Ordinance vests overly broad discretion in the Board.

*Feed the Children, Inc. v. Metropolitan Government of Nashville and Davidson*, 330 F. Supp.2d 935, 946 (M. D. Tenn. 2002) (footnote omitted). The Ordinance simply is not sufficiently clear as to when a permit is to be issued.

Maryville strongly argues that its actual practice, as evidenced by testimony of Captain Graves, was of impartially and fairly issuing permits. While we do not have access to the testimony of Captain Graves, the Trial Court summarized his testimony in its findings of fact and relied on them in its conclusions of law. We also note that the Trial Court specifically found the testimony of Captain Graves to be credible. We do not overturn the credibility determination of the Trial Court. Rather, we hold that Captain Graves's testimony is not dispositive to the question of the constitutionality of the Ordinance. This case and its appeal are based on a facial challenge to the Ordinance. Even if we accept that the Ordinance has been fairly applied, we are inquiring into whether the Ordinance, by its very language and directives, is unconstitutional on its face. Consider a scenario: given an ordinance that is universally regarded as overly broad in its language, what legal conclusion regarding its fundamental constitutionality could we draw from the fact that an official applies it in an impartial way? An official lacking sound discretion, or, using a new set of procedures, could utilize the Ordinance in an unconstitutional manner according to its very text. The source of the problem is the language of the Ordinance itself, which we hold to be overly broad.

We next address whether the Trial Court erred in failing to hold that the Ordinance is impermissibly vague. The Sixth Circuit explained in *City of Dearborn*:

A statute is unconstitutionally vague if it denies fair notice of the standard of conduct for which the citizen is to be held accountable, or if it is an unrestricted delegation of power which leaves the definition of its terms to law enforcement officers. *Leonardson v. City of East Lansing*, 896 F.2d 190, 196 (6th Cir. 1990). Government officials are not vested with undue discretion under a licensing scheme, so long as the licensing scheme contains "narrow, objective, and definite standards to guide the licensing authority."

-13-

*Shuttlesworth*, 394 U.S. at 151, 89 S.Ct. 935.

*City of Dearborn*, 418 F.3d at 608-09.

The language of the Ordinance contains the unhelpful and confusing term "Similar group". "Similar group" could plausibly encompass any congregation of people. It does not require a strained interpretation of "similar group" to appreciate how intrinsically vague this term is. Multiple people who gather for a common purpose rationally could be deemed a "group" that is "similar" to a club. While the term "club" may evoke membership, rules and a formal, fixed purpose, a "similar group" might contain certain parallel traits and yet not constitute an actual organized club. This language is too open-ended and subject to numerous reasonable interpretations.

The language of the Ordinance is not salvaged or narrowed by its inclusion of examples. The Ordinance states: "It shall be unlawful for any club, organization, or similar group to hold any meeting, parade, demonstration, or exhibition on the public streets without some responsible representative first securing a permit . . ." On the contrary, the inclusion of the terms "similar group" and "meeting," rather than clarifying the examples listed, dramatically enlarge the class of persons and situations potentially subject to the Ordinance.

We note that the Sixth Circuit in *City of Dearborn*, while holding that the ordinance there was overly broad and not narrowly tailored, did not hold that the ordinance was vague. However, there are important distinctions. The ordinance in *City of Dearborn* defined "'special event' as any 'organized group having a common purpose or goal'." *City of Dearborn*, 418 F.3d at 610. The other language in *City of Dearborn* alleged to be vague was the ordinance's direction that the Dearborn city council "'shall'" grant the permit provided the special event is "'for a lawful purpose and will not in any manner act so as to breach the peace or unnecessarily interfere with the public use of the streets, sidewalks, parks and public areas.'" *Id*. We find these examples of ordinance language disparate.

We fully acknowledge Maryville's legitimate interest in preserving order and safety on its streets. Nothing in this Opinion diminishes the right of municipalities to protect people on their roadways. However, the particular measure at issue in this case fails to pass constitutional muster as it is vague, overly broad, and affords too much discretion to the officials charged with issuing permits. We hold that the Ordinance is unconstitutional on its face and cannot stand as written.

## Conclusion

The judgment of the Trial Court is reversed, and this cause is remanded to the

Trial Court solely for collection of costs below.  The costs on appeal are assessed against the appellee, the City of Maryville.

_____
D. MICHAEL SWINEY, JUDGE