OPINION OF THE COURT
Gerald Harris, J.
The cases against the eight defendants were consolidated for trial on consent. Each of the defendants is charged in the prosecutor’s information with parading without a permit (Administrative Code of City of NY § 10-110 [c]) and two counts of disorderly conduct (Penal Law § 240.20 [5], [6]).
Prior to trial, the motion court denied defendants’ motion to dismiss all charges as facially insufficient and unconstitutional (Abraham Clott, J., June 13, 2005).
A trial was held before the court without a jury on October 17, 18 and 19, 2005. At the conclusion of the trial the court granted the defendants’ trial motion to dismiss, for legal insufficiency of the evidence, the count charging the defendants with congregating with other persons in a public place and refusing to comply with a lawful order of the police to disperse (Penal Law § 240.20 [6]). Decision was reserved on the remaining two counts and counsel have submitted and exchanged briefs.
*426 The Evidence
. The evidence established that, on the evening of January 28, 2005, a Friday, numerous persons, many of them with bicycles, began to gather in Union Square Park.[1] Beginning at approximately 6:00 p.m. and continuing for approximately 30 to 45 minutes, a police van stationed in the park repeatedly broadcast over loudspeakers a recorded message which said, in substance:
“[I]t is dangerous and illegal to ride a bicycle in a procession on the public streets within New York City if a permit has not been issued by the New York City Police Department. No permit has been issued for a bicycle procession for tonight, January 28, 2005. If you ride in a procession this evening, you will be arrested and your bicycle will be seized.”
Police officers attached to the Community Affairs Unit distributed flyers containing substantially the same message to persons within the park. Only one of the defendants, Jameson Rollins, whose image was captured on videotape, was identified as being present in the park. None of the defendants was seen accepting a flyer and no flyer was found in the possession of any defendant at the time of arrest.
At approximately 7:30 p.m. a large group of bicyclists was seen riding out of the park. The testimony of the several police witnesses gave varying estimates of the number of riders. The estimates ranged between 50 and 100. Approximately 15 police officers on motorized scooters followed the bikers.
The testimony consistently described the group of bikers as riding briefly on Union Square West, then eastbound on 14th Street to Fifth Avenue. There was testimony that, as the bikers exited the park en masse, cars on Union Square West were forced to stop and wait.
At the intersection of 14th Street and Fifth Avenue, the bikers were seen riding around and between cars waiting at a red light. The group of bikers rode through the red light without stopping and made a left onto Fifth Avenue. At that point the bikers spread across the entire roadway from curb to curb as they rode south on Fifth Avenue. Some cars traveling down Fifth Avenue were caused to slow or stop as the bikers rode beside and in the front of them.
*427 The testimony further established that each of the eight defendants was seen riding within the group of bikers down Fifth Avenue and each defendant was individually identified as participating in that ride. Four of the defendants, Brendan Oram, Teresa Carta, Joel Fitzpatrick, and Tyler Hartz, were arrested by Lieutenant Patrick Steffens after they stopped on Fifth Avenue between 13th and 14th streets and stood straddling their bikes.
At about 11th Street, on Fifth Avenue, the scooters surged ahead of the bikers and attempted to stop them by forming a line of scooters across the roadway. Four of the defendants, Kimberly Perfetto, Jameson Rollins, Kyle Jones and Jennifer Bezjak, were arrested as they approached or attempted to bypass that roadblock.
The testimony of Lieutenant Sam Centamore, the police official who had the responsibility of overseeing the processing of applications for parade permits, keeping the records of such applications and permits and signing off on any permits that were issued, established that no permit had been applied for or issued for a procession to be held January 28, 2005, south of 17th Street.
In support of defendants’ earlier motion to dismiss, there was submitted an affidavit of defendant Teresa Carta. The People offered that affidavit in evidence at the trial. The court, which reserved decision on its admissibility, now finds that the Carta affidavit is admissible as an informal judicial admission against the defendant Carta only. (See People v Rivera, 45 NY2d 989 [1978].) Although an informal judicial admission is not conclusive, it is evidence of the facts admitted. (People v Rivera, supra.)
The Carta affidavit contains the following admissions:
“On January 28, 2005, I went to Union Square, intending to ride my bicycle in the Critical Mass ride. New York City Police Department Community Affairs officers appeared to be handing flyers to people with bicycles ... I left Union Square via Union Square West at approximately 7:30 P.M. I stopped my bicycle at the red light at the intersection of Union Square West and 14th Street. After the light turned green, I made a right turn onto 14th Street heading west ... I was riding on 14th Street between Union Square West and 5th Avenue ... I turned left onto 5th Avenue. I got off my bicycle, intending to leave, and walked it toward the *428 curb. A police officer grabbed my shoulder and said ‘You’re arrested’.”
The People also offered in evidence the affirmation of Paul A. Higgins, described as an attorney and volunteer legal observer. This affirmation, too, had been submitted by defendants in support of their motion to dismiss. The People have not called Mr. Higgins as a witness nor shown his unavailability. They argue that the affirmation is admissible as an adopted admission. Defendants argue that the affirmation was submitted for motion purposes only and that its admission at trial would deprive defendants of their constitutional right of confrontation and cross-examination. The court agrees and the Higgins affirmation is not received in evidence.
The Issue of Law of the Case
As already described, the motion court earlier denied defendants’ motion to dismiss the charges as constitutionally defective. The motion court concluded
“that the City’s permitting scheme is facially an appropriate content-neutral regulation of the time, place and manner of all uses of the City streets by individuals moving along the roadway as a group on foot, bicycles, or in vehicles. On its face, the permitting scheme appears to be narrowly tailored to meet the government’s traditional, significant interest in keeping the streets open and available for movement, leaves open alternatives for expression, provides guidelines limiting the police commissioner’s discretion in granting or denying permits within specific time periods, and provides a mechanism for appeal.” (Clott, J., June 13, 2005.)
Defendants persist in their challenge to the parade permitting scheme and the threshold issue is whether the trial court is bound by the ruling of the motion court.
The law of the case doctrine is not statutory but is a judicially crafted policy that expresses the practice of courts generally to refuse to reopen what has been decided and is not a limit to their power. As such, law of the case is necessarily amorphous in that it directs a court’s discretion but does not restrict its authority. (See, People v Evans, 94 NY2d 499 [2000], and cases cited therein; see, also, People v Leone, 44 NY2d 315, 321 [1978, Fuchsberg, J., concurring] [“where circumstances require it, one Judge has the power to deviate from a decision made by another”].) The law of the case doctrine is not binding *429 when there exist exceptional circumstances warranting reconsideration of an order of a court of coordinate jurisdiction. (See, People v Delgado, 225 AD2d 478 [1st Dept 1996], lv denied 88 NY2d 983 [1996].) In Delgado, the exceptional circumstances apparently arose from the inadequacy of the moving papers, upon which a hearing was granted, and the fact that the trial court was considerably more familiar with the facts of the case than the motion court.
In People v Barrows (177 Misc 2d 712 [Sup Ct, Kings County 1998]), the motion court denied a motion to dismiss upon a constitutional challenge. The trial court deemed it necessary to reconsider that argument, based upon voluminous trial evidence. This court, too, for the reasons set forth, concludes that the ruling of the motion court is not binding.[2]
Among the circumstances that the court views as compelling a review of the constitutional issues raised by the defendants, notwithstanding the denial of their pretrial motion, are the following.
The trial court heard the testimony of 11 witnesses during three days of trial resulting in a trial transcript of more than 600 pages. This testimony highlighted deficiencies in the City’s parade permit scheme. This information was not available to the motion court.
The motion court did not address the specific issues of whether the statute was overbroad in that it failed adequately to define what constitutes a parade or procession and because it gives no guidance as to what minimum number of participants may implicate the statute.
Nor did the motion court address the potentially chilling effect upon freedom of expression inherent in a statute that purports to impose strict criminal liability upon persons who may join a procession without being aware that a required permit has not been issued.
Finally, at the time of its ruling, the motion court did not have the benefit of a recent ruling by a federal appellate court which holds, with compelling logic, that a statute, such as the one here involved, is not narrowly tailored and does not pass constitutional muster. (See, American-Arab Anti-Discrimination Comm. v City of Dearborn, 418 F3d 600 [6th Cir 2005].)
*430 Thus, this court is constrained to find that it is not bound by the ruling of the motion court that the City’s parade permit scheme is not unconstitutional on its face.
Constitutionality of New York City’s Parade Permit Scheme
(Administrative Code § 10-110)
In reviewing defendants’ challenge to Administrative Code § 10-110 the court is mindful that facial challenges to statutes are generally disfavored and that legislative enactments carry a strong presumption of constitutionality. (People v Stuart, 100 NY2d 412 [2003].) With exceptions not here relevant, in order to conduct a parade in New York City, a permit must be applied for and obtained from the Police Commissioner. The application must be submitted not less than 36 hours before forming or commencing to parade. (Administrative Code § 10-110 [a].) This statute must be read in tandem with title 38, chapter 19 of the Rules of the City of New York which are incorporated in the New York City Charter and Administrative Code (see, People v James, 7 Misc 3d 363 [Crim Ct, NY County 2005].)
38 RCNY chapter 19 prescribes the required content of a parade application (38 RCNY 19-03), the procedure by which the Police Commissioner is to exercise his authority and the circumstances under which approval will be withheld. (38 RCNY 19-04.) Section 19-02 sets forth the definitions of various terms, including “parade or procession.” Administrative Code § 10-110 and 38 RCNY 19-01 et seq., when read together, are commonly referred to as “the City’s parade permit scheme.” Every participant in a parade for which a required permit was not issued may be punished by a fine or imprisonment or both. (Administrative Code § 10-110 [c].)
As previously described, defendants’ pretrial motion to dismiss the charges in the complaint, as facially insufficient and unconstitutional, was denied by the motion court. Just prior to trial, defendants argued that the trial court should read a mens rea requirement into Administrative Code § 10-110 (c). The People contended that the statute imposes strict liability. The court reserved decision and permitted evidence of knowledge and/or intent at the trial. After completion of the trial, defendants again argued the facial insufficiency and unconstitutionality of the charges.
A parade or procession is, invariably, an exercise of expression. (MacDonald v Safir, 206 F3d 183, 189 [2d Cir 2000] *431 [“There can be ... no doubt that (section) 10-110, by regulating permits for parades in New York City, has a close nexus to ‘conduct commonly associated with expression’ ”]; Dearborn, supra; Bray v City of New York, 346 F Supp 2d 480, 488 [SD NY 2004] [“participation in the Critical Mass bike rides constitutes ‘expressive association’ entitled to First Amendment protection”].) When a statute is challenged as violative of the First Amendment, the standard by which it must be measured is not vagueness but whether it is overbroad. (People v Stuart, 100 NY2d 412, 422 n 8 [2003].)
In addressing a rule of the New York City Department of Parks and Recreation, regulating assemblies and rallies held in city parks, the Second Circuit Court of Appeals opined that, because the regulations condition the exercise of expressive activity on official permission — a Parks Department permit— they do constitute a “prior restraint” on speech. (Beal v Stern, 184 F3d 117, 124 [2d Cir 1999].) The court cited Southeastern Promotions, Ltd. v Conrad (420 US 546 [1975] [the essence of prior restraints is that they give public officials the power to deny use of a forum in advance of actual expression]) and Forsyth County v Nationalist Movement (505 US 123 [1992] [ordinance requiring permit and fee before authorizing public speaking, parades, or assemblies is prior restraint]).
The significance of labeling a licensing scheme a prior restraint is the imposition of a stricter standard in assessing the constitutionality of the scheme. (Freedman v Maryland, 380 US 51 [1965].)
However, the Supreme Court subsequently distinguished Freedman, by finding its requirements inapplicable to a licensing scheme which is not subject matter censorship but rather a content-neutral time, place and manner regulation of the use of a public forum. (Thomas v Chicago Park Dist., 534 US 316 [2002].)
In its opinion denying defendants’ pretrial motion to dismiss, the motion court in this case correctly held that the City’s parade permit scheme is a content-neutral time, place and manner regulation of the use of city streets. However,
“even content-neutral time, place, and manner restrictions can be applied in such a manner as to stifle free expression. Where the licensing official enjoys unduly broad discretion in determining whether to grant or deny a permit, there is a risk that he will favor or disfavor speech based on its *432 content” (Thomas v Chicago Park Dist., supra at 323).
Where the permit requirement would include almost any imaginable procession on the City’s streets, without regard to size or number of participants, the statute is hopelessly over-broad. (Dearborn, supra at 608.) The motion court found that the City’s permit scheme passed constitutional muster because it is narrowly tailored. This court is constrained to find otherwise. Administrative Code § 10-110 (a) provides that a permit is required for a “procession, parade or race . . . upon any street or in any public place.” 38 RCNY 19-02 (a) defines a “parade or procession” as “any march, motorcade, caravan, promenade, foot or bicycle race, or similar event of any kind, upon any public street or roadway.”
Although there may be implicit in this definition the concept of multiple participants, the commonly assigned or dictionary meaning of some of the terms used does not support that concept. Thus, a promenade is defined as “a leisurely walk or ride esp. in a public place for pleasure or display”; race is “a contest of speed.”[3] Therefore, a parade as defined in the statute can be descriptive of the activity of an individual or a small group.
Unlike the ordinance upheld in Thomas v Chicago Park Dist. (supra), which, by its terms applied to events involving more than 50 individuals, the City’s permit scheme gives no guidance as to the minimum number of persons which constitutes a parade or procession requiring a permit.[4]
In ruling that a permit ordinance of the City of Dearborn, Michigan, was overly broad, the Sixth Circuit Court of Appeals recently said:
“Permit schemes and advance notice requirements that potentially apply to small groups are nearly always overbroad and lack narrow tailoring. The Ordinance is overly broad because under the Ordinance as written, any procession of people with a common purpose or goal, whether it be a small *433 group of protesters or a group of senior citizens walking together to religious services, are conceivably required to obtain a permit from the city of Dearborn.” (American-Arab Anti-Discrimination Comm. v City of Dearborn, 418 F3d 600, 608 [6th Cir 2005].)
Improbable though it may be, under the City’s permit scheme as written, a person promenading, or two persons racing, are conceivably required to obtain a permit from the City of New York. Similarly, a funeral procession, two or three cars displaying political posters traveling one behind the other, caravan style, or a small group of friends biking together could run afoul of the law.
While these examples may seem to strain a commonsense application of the permit scheme, they serve to highlight the virtually unfettered discretion reposed in the Police Commissioner to determine when any particular event may be found to fall within the amorphous definition of parade or procession and, thus, requires a permit.
The fact that the defendants were part of a group exceeding 50 bicyclists does not preclude a facial challenge to the scheme. (See, Forsyth County, 505 US at 129 [facial challenge to provision can lie “even though its application to the case under consideration may be constitutionally unobjectionable”].) Instead, the question remains whether the provision does, as alleged, “vest[ ] unbridled discretion in a government official over whether to permit or deny expressive activity.” (City of Lakewood v Plain Dealer Publishing Co., 486 US 750, 755 [1988].)
It is possible that an otherwise overly broad permit scheme can be saved by a limiting interpretation, consistently applied by the enforcing agency. (See Ward v Rock Against Racism, 491 US 781, 795-796 [1989] [“(a)dministrative interpretation and implementation are . . . highly relevant . . . (i)n evaluating a facial challenge” (internal quotation marks omitted)].) However, there is no evidence in the record of this trial that there exists and has been implemented an authoritative practice of the Police Department to limit the exercise of its discretion in a constitutionally permissible manner. Indeed, there was testimony that the practice of the Police Department is in a state of flux — while Critical Mass rides have been occurring for years, only recently have the police made arrests for proceeding without a permit.
*434 Furthermore, the court may not simply presume that an official will adhere to standards not evident on the regulation’s face or embodied in authoritative decisions or practice. (Beal v Stern, 184 F3d at 127; see also City of Lakewood, 486 US at 770 [the doctrine prohibiting unbridled discretion requires that the limits the agency claims are implicit in the regulations be made explicit by textual incorporation, binding judicial or administrative construction or well-established practice].) Accordingly, the permit scheme is not narrowly tailored but is overly broad and, therefore, unconstitutional on its face.
Another constitutional infirmity of the City’s permit scheme as written is the absence of a requirement of mental culpability. As with the Dearborn ordinance, there is no mens rea requirement — participation is all that is required to violate the law. The People argue that a strict liability standard should be imposed.
As in Dearborn, the question is whether the strict liability component of the City’s permit scheme chills the exercise of First Amendment rights. The Dearborn court described parades and processions as “a unique and cherished form of political expression.” (Dearborn, supra at 611.) When a strict liability statute potentially affects First Amendment freedoms, it may “have the collateral effect of inhibiting the freedom of expression, by making the individual the more reluctant to exercise it.” (Smith v California, 361 US 147, 151 [1959].)
Under the City’s permit scheme, any person who unknowingly participates in a permitless march may be arrested, fined or imprisoned. Thus, bystanders or onlookers, stirred by the passion evoked by a political march, join it at their peril. As the Sixth Circuit held in Dearborn:
“A good-faith belief is no excuse, and thus the potential protester cannot rely upon the assurances of participants in the march. Rather, the potential protester would be well-advised to seek personal verification from a city official that the demonstration has been authorized, or run the risk of being thrown in jail. [Such a requirement] . . . is antithetical to our traditions, and constitutes a burden on free expression that is more than the First Amendment can bear.” (Dearborn, supra at 612.)
While the statute’s failure to require proof of knowledge or intent is a serious constitutional flaw, the infirmity can be overcome, as defendants concede, by reading into the statute a *435 requirement of knowledge or intent. Indeed, Penal Law § 15.15 (2) requires a court to import such an element into the statute.
Penal Law § 15.15 (2), in relevant part, provides:
“Although no culpable mental state is expressly designated in a statute defining an offense, a culpable mental state may nevertheless be required for the commission of such offense ... if the proscribed conduct necessarily involves such culpable mental state. A statute defining a crime, unless clearly indicating a legislative intent to impose strict liability, should be construed as defining a crime of mental culpability. This subdivision applies to offenses defined both in and outside this chapter.”
The Penal Law does not favor offenses of strict liability. (Donnino, Supp Practice Commentary, McKinney’s Cons Laws of NY, Book 39, Penal Law art 15.) Here, there is no indication of legislative intent to impose strict liability, and since the proscribed conduct is a form of expression, there is virtually a mandate to construe the statute as requiring mental culpability. (Dearborn, supra.) Accordingly, the court holds that the People have the burden of proving that each defendant was aware of the lack of a required permit and knowingly participated in the event notwithstanding that knowledge.
Had the court not determined the parade permit scheme to be overbroad and facially invalid, it would then have been required to address whether the People had proven beyond a reasonable doubt whether the defendants, or any of them, had knowledge of the lack of a required permit when they participated in the bike ride on January 28, 2005.
For the sake of making a clear record, the court does find that the evidence established such knowledge on the part of two defendants, Jameson Rollins and Teresa Carta.
There was a basis for concluding that anyone present in Union Square Park just prior to the bike ride must have been aware that no permit had been issued and that participants in the ride would be subject to arrest. Such knowledge may be reasonably inferred from the repeated and loud messages broadcast by a police van in the park. The wholesale distribution of flyers within the park, bearing the same message, buttresses the likelihood that anyone present in the park got the message.
However, only two defendants were shown to be present in the park — Jameson Rollins, who is captured in the video made by surveilling police officers, and Teresa Carta, by her own *436 admission. Thus, even if the parade permit scheme as written is ultimately upheld, the People have failed to prove a violation thereof by any defendants other than Rollins and Carta.
It is not the court’s holding that the City may not regulate parades and processions upon city streets. To the contrary, it is well settled that a municipality has the authority to impose regulations in order to assure the safety and convenience of the people in the use of public highways even though such regulations may limit the exercise of First Amendment rights. (Cox v New Hampshire, 312 US 569 [1941]; Cantwell v Connecticut, 310 US 296 [1940].)
What the court does hold is that, when a statute subjects to arrest and punishment persons participating in a parade or procession, that statute must be content-neutral and narrowly tailored. While Administrative Code § 10-110 is content-neutral, it is not, for the reasons discussed, narrowly tailored.
The overbreadth of Administrative Code § 10-110 may be easily remedied. First, the definition of “parade” or “procession” must be made more precise. A provision that sets forth the minimum number of participants to which it applies, provided that number bears a reasonable relationship to the conditions sought to be prevented, i.e., the unlawful congestion of city streets, may well satisfy the constitutional requirement of narrow tailoring.
The absence of a mental culpability requirement may be overcome by reading into the statute such a requirement pursuant to Penal Law § 15.15 (2) or by an amendment to the statute expressly requiring the element of knowledge or intent.
However, as now written, the City’s parade permit scheme is unconstitutional on its face and defendants’ trial motion to dismiss count three of the prosecutor’s information is granted.
The Charge of Failure to Comply with a Lawful Order to Disperse
(Penal Law § 240.20 [6])
There was no evidence offered by the People that an order to disperse, lawful or otherwise, was ever given by the police to the defendants or to any other person.
The People contend that the message broadcast by the sound van in Union Square Park, and the flyers distributed there, constituted such an order. That contention is without merit. Such *437 messages may be described more appropriately as advisories or cautions, that persons choosing to ride risked arrest and seizure of their bicycles. They cannot be characterized as an order to disperse and the record is barren of any other evidence to suggest that such an order was given.
For these reasons, the court granted the defendants’ trial motion to dismiss, made at the end of the trial, for lack of legal sufficiency.
The Charge of Obstructing Vehicular and Pedestrian Traffic
(Penal Law § 240.20 [5])
It is well settled that municipalities have the authority to impose regulations in order to assure the safety and convenience of the people in the use of public highways and such regulation is not inconsistent with civil liberties. (Feiner v New York, 340 US 315 [1951]; Cox v New Hampshire, supra; Cantwell v Connecticut, supra.)
When conduct, even taking the form of protest, seriously interferes with vehicular or pedestrian traffic, prosecutions for disorderly conduct are appropriate and constitutional. (People v Penn, 48 Misc 2d 634 [1964], affd 16 NY2d 581 [1965], cert denied 383 US 969 [1966]; People v Turner, 48 Misc 2d 611 [App Term, 1st Dept 1965].)
Bicycles are vehicles entitled to the use of the public roads. However, from a practical perspective, they differ in important respects from motorized vehicles. They generally move at a slower speed than cars, and bicyclists are more vulnerable to injury. These distinctions are recognized in the traffic rules that provide special lanes for bicycles and, in the absence of such lanes, require that they travel at the margins of the roadway. These regulations serve the dual purpose of affording bicyclists a measure of protection at the same time that they structure a traffic flow less likely to be impeded by slower moving vehicles.
While a single cyclist’s disregard of these regulations may not amount to an obstruction of vehicular traffic, a large group of cyclists riding together, and spread across the roadway from curb to curb, effectively creates a roadblock that slows and impedes the passage of other traffic.
When this conduct is coupled with a disregard of traffic signals and a pattern of weaving around and in front of motor vehicles, the risk of provoking public disorder is real and imminent and the bicyclists are plainly demonstrating an intent to *438 cause such disorder or a reckless disregard of creating a risk thereof.
Here, the evidence established, beyond a reasonable doubt, that each of the eight defendants were participants in a group of at least 50 bicyclists and, as part of that group, rode their bikes in a manner which obstructed the flow of vehicular traffic.
Accordingly, each of the defendants is found guilty of violating Penal Law § 240.20 (5).
Conclusion
Count two of the prosecutor’s information, charging a violation of Penal Law § 240.20 (6), is dismissed as the evidence presented was legally insufficient to establish the offense charged. Count three of the prosecutor’s information charging a violation of Administrative Code § 10-110 is dismissed as constitutionally invalid.
Each of the defendants is found guilty of violating the first count of the prosecutor’s information charging a violation of Penal Law § 240.20 (5).

. The gathering of bicyclists who then ride together as a group has been a recurring phenomenon for a number of years and has commonly been referred to as “Critical Mass.”

. The court is mindful of those cases holding that evidentiary rulings are not binding while rulings upon issues of law generally are. However, exceptional circumstances exist which warrant a revisitation of the constitutional issues.

. Webster’s Ninth New Collegiate Dictionary.

. 38 RCNY 19-02 (d) defines “demonstration” to mean “a group activity including, but not limited to, a meeting, assembly, protest, rally or vigil, moving or otherwise, which involves the expression of views or grievances, involving more than 20 people.” However, no reference to “demonstration” is contained in Administrative Code § 10-110 nor in the charges brought against the defendants. Thus, its inclusion in the definitions provided in section 19-02 appears to be without legal significance.