**UNITED STATES OF AMERICA,**

v.

**Gasir SUED, Defendant.**

**No. 01 CR MIS 1 PG 5 FM.**

United States District Court,
S.D. New York.

May 10, 2001.

## OPINION AND ORDER

MAAS, United States Magistrate Judge.

This case involves one of the relatively few petty offense proceedings prosecuted in this District each year. Even more unusual is the fact that the defendant, Gasir Sued, seeks to challenge the constitutionality of two of the three provisions under which he has been charged. Sued alleges that both of these provisions are facially invalid. For the reasons set forth below, Sued's motion to dismiss those charges is denied.

## FACTUAL BACKGROUND

*Introduction*

The Statue of Liberty, designed by Frederic Auguste Bartholdi, was given to the people of this country by the people of France in the late 1800s. (http:// www.nps.gov/stli/prod02.htm). The Statue and the island on which it was erected together constitute a national monument which has been administered by the National Park Service for many decades. *See* 16 U.S.C. § 431 (granting the President the authority to declare structures and objects on land owned or controlled by the United States as national monuments);

Presidential Proclamation Nos. 1713, 43 Stat.1968 (Oct. 15, 1924)(declaring the Statue a national monument), 2250, 51 Stat. 393 (Sept. 7, 1937)(expanding the Park Service's jurisdiction to the entire island), and 3656, 79 Stat. 1490 (May 11, 1965)(incorporating Ellis Island into the Statue of Liberty national monument).

As a symbol of freedom from persecution, the Statue has been the site of numerous protests over the years. For example, in 1988, five Cubans seeking the ouster of Fidel Castro handcuffed themselves to a railing inside the Statue's crown, disrupting visitors. (*See 5 Cubans State Protest in Statute of Liberty,* NEW YORK TIMES, Aug. 28, 1988, at 38). Similarly, in 1981, four Iranian students, who were part of a larger group protesting the Khomeni regime, were arrested after they chained themselves to a balcony railing at the Statue's pedestal; the incident stopped ferry service to Liberty Island for more than two hours. (*See 4 Khomeni Foes Held on Liberty Island,* NEW YORK TIMES, July 24, 1981, at B3).

This case arises out of a recent protest at the Statue. According to the Government, on November 5, 2000, a group of protesters hung banners and a Puerto Rican flag from the top of the Statue of Liberty and distributed literature to protest the use of Vieques Island, Puerto Rico, for naval bombing exercises. They also distributed literature in support of their cause inside the Statue. (*See* March 4, 2001 letter to the Court from AUSA Robin A. Linsenmayer ("Linsenmayer II")). Prior to their demonstration at the Statue, the protesters, including Sued, did not apply for either a "public assembly" or a "printed matter" permit from the Superintendent of Liberty Island. (*See* Feb. 27, 2001 letter from AUSA Linsenmayer to the Court ("Linsenmayer I")).

One of the protesters, Alberto DeJesus Mercado, is alleged by the Government to have climbed through a window in the Status's crown to hang the banners and flags. The United States Attorney charged Mercado in an information with Criminal Trespass in the Third Degree under the federal Assimilative Crimes Act, 18 U.S.C. § 13(a), and his case was assigned to Magistrate Judge Dolinger. (*See* Linsenmayer II). The *Mercado* case was tried on April 3, 2001; I am advised that Judge Dolinger later found the defendant guilty in a decision rendered from the bench on April 30, 2001.

Sued is alleged to have participated in the November 5th protest by distributing literature in, and refusing the directives of the Park Police to descend from, the Statue's crown. (*Id.*). As a consequence of his actions, and those of his fellow protesters, visits to the Statue were apparently disrupted for several hours. (*See* William Neuman, *Vieques–Bomb Protesters Shut Down Statue of Liberty*, N.Y. POST, Nov. 6, 2000, *available at* 2000 WL 30248212).

*Charges Against Sued*

Sued's alleged conduct resulted in his being served with three separate citations, charging him with violations of 36 C.F.R. §§ 2.51(h)(unlawful demonstration/assembly), 2.52(h) (unlawful distribution of printed matter), and 2.32(a)(2)(disobeying a lawful order). All three of the citations contain similar recitations of the relevant facts. The most expansive statement, in the citation for disobeying a lawful order, summarizes the events giving rise to that charge as follows:

> On 11/5/00 at approx. 1020 hrs. a report of a man climbing out of the crown window was broacasted on the radio. Upon arriving, Def. was part of a group of 6 people in the crown of the Statue. I directed Def. + his group to go down the steps of the crown so that I could clear the area. Def. refused to go down and he continued to hand out flyers. At this time (when additional Police Officers arrived) Def. was arrested. Note: the area of the crown needed to be cleared out because a man was standing on the outside of the crown. Def. was part of a demonstration held in the crown + involved w/ man on crown

(*See* Linsenmayer I).

*Permit Procedures*

The National Park Service web site indicates that any person or group wishing to "conduct a demonstration, display a banner, ... [or] have a meeting" at the Statue of Liberty must apply for a permit on an approved form "a minimum of 72 hours in advance" unless this period is "waived by the Superintendent or designee." (*See* March 9, 2001 letter to the Court from AUSA Linsenmayer ("Linsenmayer III") at Ex. D; http://www.nps.gov/stli/prod01.htm# Public (last visited Apr. 30, 2001)). Persons or groups seeking to distribute printed matter at the Statue similarly are instructed to apply for a permit at least 72 hours before their planned activities, and there is no mention on the web site of this period being waived. (*Id.*). Only two public.assembly and two printed matter permits are issued on a "first come, first served basis" for any given day. Furthermore, the permitees must restrict their activities to a two-hour period in a designated portion of the flagpole area at Liberty Island. (*Id.*). Even in that area, the permitees may not "interfere with normal public use or pedestrian flow." (*Id.*).

Although the published procedures afford National Park Service officials at least 72 hours to review each written permit application, in practice the review is considerably less involved. Indeed, both the Concessions Management Specialist and

the Administrative Sergeant of the Park Police assigned to Liberty Island routinely approve permit applications submitted on the day of a proposed event unless there is a scheduling conflict. (*See* Linsenmayer III Exs. E (Affirmation of Tonia Best, dated Mar. 8, 2001 ("Best Affirm.")) ¶ 10; F (Affirmation of Sergeant Ian Crane, dated Mar. 8, 2001 ("Crane Affirm.")) ¶¶ 9–11). Both individuals aver that their decisions regarding applications for assembly permits and printed matter permits are content neutral; in fact, the Concessions Management Specialist states that she does "not recall ever having denied an application for a permit for public demonstration or assembly, or to distribute printed matter." (*See* Best Affirm. ¶¶ 8–9; Crane Affirm. ¶ 9). Moreover, although on-the-spot applicants are subject to a $25 permit fee, the Sergeant indicates that this fee is always waived if the applicant merely represents "that he or she does not have the funds." (*See* Crane Affirm. ¶ 11).[1]

The regulations promulgated by the Park Service do not indicate how long the Superintendent or the Superintendent's designee may take to review an application for a public assembly or printed matter permit. Nevertheless the Sergeant's affirmation states that the "process of applying for and receiving a permit to engage in an immediate public demonstration or assembly, or to distribute printed matter, typically takes 15 to 20 minutes or less." (Crane Affirm. ¶ 10). The Management Concessions Specialist also states that, to her recollection, "no permit application has ever been denied because it was not submitted sufficiently in advance of the proposed date of the event." (Best Affirm. ¶ 10).

## DISCUSSION

The First Amendment states that "Congress shall make no law . . . abridging the freedom of speech." This fundamental right has been characterized as "indispensable to the discovery and spread of political truth." *Consolidated Edison Co. v. Public Serv. Comm'n,* 447 U.S. 530, 100 S.Ct. 2326, 65 L.Ed.2d 319 (1980)(quoting *Whitney v. California,* 274 U.S. 357, 375, 47 S.Ct. 641, 648, 71 L.Ed. 1095 (1927)(Brandeis, J., concurring)). To ensure the requisite free flow of ideas, streets, parks, and other public places have traditionally been among the fora in which citizens are afforded the opportunity to exercise their right to free speech. *Burson v. Freeman,* 504 U.S. 191, 196–97, 112 S.Ct. 1846, 1850, 119 L.Ed.2d 5 (1992); *City of Lakewood v. Plain Dealer Pub'g Co.,* 486 U.S. 750, 777, 108 S.Ct. 2138, 2155, 100 L.Ed.2d 771 (1988); *Hague v. Committee for Indus. Org.,* 307 U.S. 496, 515, 59 S.Ct. 954, 964, 83 L.Ed. 1423 (1939)(Roberts, J., concurring).

 Any prior restraint on expression gives rise to a "heavy presumption" against its validity. *Nebraska Press Assoc. v. Stuart,* 427 U.S. 539, 558, 96 S.Ct. 2791, 2802, 49 L.Ed.2d 683 (1976). Nevertheless, "even in a public forum the government may impose reasonable restrictions on the time, place, or manner of protected speech, provided the restrictions 'are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information.'" *Ward v. Rock Against Racism,* 491 U.S. 781, 791,

1. Appendix 3 to the National Park Service Director's Order # 53 further states that when the requested use involves the exercise of First Amendment rights, "the [S]uperintendent will issue a permit without any requirement for fees, cost recovery, bonding or insurance." (*See* Linsenmayer III, Ex. B at 2).

109 S.Ct. 2746, 2754, 105 L.Ed.2d 661 (1989)(quoting *Clark v. Community for Creative Non–Violence,* 468 U.S. 288, 293, 104 S.Ct. 3065, 3069, 82 L.Ed.2d 221 (1984)); *accord Con. Edison,* 447 U.S. at 536, 100 S.Ct. at 2332. Accordingly when the restraints imposed by a governmental entity delegate overly broad—and therefore potentially content-based—licensing discretion to a public official, they cannot withstand constitutional scrutiny. *Forsyth County v. Nationalist Movement,* 505 U.S. 123, 130, 112 S.Ct. 2395, 2401, 120 L.Ed.2d 101 (1992).

In this case, it is alleged that Sued and his accomplices engaged in a demonstration at the Statute of Liberty without having previously sought a public assembly or printed matter permit from the Park Service Superintendent at Liberty Island or the Superintendent's designee. Accordingly, Sued cannot attack the charges in this case on the theory that the Park Service violated his First Amendment rights as a consequence of the manner in which its permit procedures were applied to him. Rather, the only argument available to him is that the two contested C.F.R. provisions are unconstitutional on their face. "Such challenges are cognizable in a First Amendment context even where the application of the licensing scheme to the challenger's own speech is constitutional." *Prayze FM v. FCC,* 214 F.3d 245, 252 (2d Cir.2000). Thus, "[o]ne who might have had a license for the asking may ... call into question the whole scheme of licensing when he is prosecuted for failure to procure it." *Freedman v. Maryland,* 380 U.S. 51, 56, 85 S.Ct. 734, 737, 13 L.Ed.2d 649 (1965)(quoting *Thornhill v. Alabama,* 310 U.S. 88, 97, 60 S.Ct. 736, 742, 84 L.Ed. 1093 (1940)).

In his letter to the Court, Mr. Stolar explains that his client's First Amendment challenge to 36 C.F.R. §§ 2.51 and 2.52 is based upon the Eleventh Circuit's decision in *United States v. Frandsen,* 212 F.3d 1231 (11th Cir.2000). There, the defendants, and others, were cited for a violation of § 2.51 because they engaged in a demonstration at a national park without having previously secured a public assembly permit. The Court of Appeals concluded that the regulation was facially invalid because it required a permit to be issued "without unreasonable delay," *see* 36 C.F.R. § 2.51(c), but did not set a specific time limitation on the exercise of the Superintendent's discretion. *Id.* at 1240. As Mr. Stolar accurately observes, because the "without unreasonable delay" language also appears in 36 C.F.R. § 2.52(c), which relates to printed matter permits, the reasoning of *Frandsen,* if correct, should be equally applicable to that provision.

The only other court to address the facial validity of either of the provisions that Sued contests in this action reached a contrary conclusion. In *United States v. Kistner,* 68 F.3d 218 (8th Cir.1995), the defendant refused to apply for a permit to distribute literature at a national memorial, stating that "God's rules were higher than those of the government." *Id.* at 219. Following his conviction for selling and distributing printed materials at a national memorial without a permit, the defendant appealed, contending that 36 C.F.R. § 2.52 was unconstitutional both on its face and as applied. In rejecting the first of these claims, the Eighth Circuit looked to both the Park Service's written "Policy Statement on the Sale and Distribution of Printed Matter" at the memorial and the permits that actually had been issued for the date of the offense. Based upon its review of these materials, the court concluded that the "regulation and policy statement on the sale or distribution of printed matter satisfy the requirements for a reasonable time, place, or manner restriction un-

der the First Amendment." *Id.* at 222. The court went on to hold that the regulation and policy statement also were constitutional as applied. *Id.* at 223.

■ Although the *Frandsen* decision contains a footnote questioning the correctness of the Eighth Circuit's constitutional analysis in *Kistner,* it is clear that a court that is asked whether public officials have been given excessive discretion may consider not only the text of the specific statute or regulation, but also how it has been interpreted by the persons who are charged with its implementation, and what their actual practices are. *See Rock Against Racism,* 491 U.S. at 795, 109 S.Ct. at 2756; *City of Lakewood,* 486 U.S. at 770, 108 S.Ct. at 2151. *See also Hoffman Estates v. Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 494 n. 5, 102 S.Ct. 1186, 1191 n. 5, 71 L.Ed.2d 362 (1982)("In evaluating a facial challenge to a state law, a federal court must ... consider any limiting construction that a state court or enforcement agency has proffered."); *MacDonald v. Safir,* 206 F.3d 183, 191 (2d Cir. 2000)("When evaluating a First Amendment challenge of this sort, we may examine not only the text of the ordinance, but also any binding judicial or administrative construction of it. And we are permitted—indeed, required—to consider the well-established practice of the authority enforcing the ordinance."); *Turley v. Police Dep't,* 167 F.3d 757, 762 (2d Cir.1999)(observing in connection with facial challenge to a municipal ordinance that "[t]here is no constitutional requirement, however, that the guidelines adopted by the City, to the extent they provide guidance in addition to that provided by the statute, be written down or otherwise 'documented.' ").

■ In this case, there is some question whether Sued can bring a facial challenge because he has not been charged with failing to secure the required permits, but, rather, with obstructing or impeding pedestrians and harassing park visitors. In any event, assuming that Sued has standing to assert such a claim, when the two contested regulations are examined, it is apparent that they are not invalid on their face. First, there is plainly nothing on the face of the regulations to suggest that they are anything other than content-blind, a conclusion which is buttressed by the Park Service's undisputed representations that permits for public assembly or the distribution of written materials at the Statue of Liberty are *never* denied. Indeed, when the use requested by a permittee involves the exercise of First Amendment rights, the Park Service, as a matter of policy, issues its permit without assessing any fees or costs.

Second, the regulations do not appear to afford the Park Service officials unbridled discretion. Thus, both regulations state that the Superintendent "shall" issue the permit unless the requested use falls into one of several defined categories which could lead to excessive congestion or pose a threat to public safety. Even in those circumstances, however, the Superintendent is required to inform the applicant of the decision in writing, "with the reason(s) for the denial set forth." 36 C.F.R. §§ 2.51(d), 2.52(d).

■ The regulations and accompanying procedures also appear to be a reasonable accommodation to the needs of the many different users of Liberty Island. For example, the requirement that persons seeking permits to assemble publicly or to distribute literature remain in a designated area seems entirely sensible in light of the very constricted conditions inside the Statue, of which this Court can take judicial notice. *See* Fed.R.Evid. 201(b), (c)(recognizing discretion to take judicial notice of fact not subject to reasonable dispute that

is "generally known within the territorial jurisdiction of the trial court"). In fact, it would be irresponsible, and in all likelihood dangerous, to permit demonstrations in or very near the Statue given the large crowds that often assemble there and the relative ease with which a handful of people could disrupt the flow of visitors seeking to ascend to the crown.

Finally, because the Park Service apparently *never* turns down an applicant for a public assembly or printed matter permit at Liberty Island, this does not appear to be a case in which there is a serious risk that protected First Amendment activities will be improperly squelched. Moreover, even if one were to assume that Sued and his fellow protesters would have been denied a permit had they applied, the challenged regulations did not restrict their ability to espouse their cause verbally to others in the vicinity of the Statue of Liberty. *See Kistner,* 68 F.3d at 222. They also presumably could have engaged in leafleting and public assembly in other suitable areas, such as the vicinity of the Battery Park facility from which the ferries to the Statue of Liberty embark. The contested regulations consequently afford Sued and others "ample alternative channels for communication of the information" that they sought to circulate. *See Rock Against Racism,* 491 U.S. at 802, 109 S.Ct. at 2760. *See also Shuttlesworth v. City of Birmingham,* 394 U.S. 147, 152, 89 S.Ct. 935, 939, 22 L.Ed.2d 162 (1969)(quoting *Cox v. Louisiana,* 379 U.S. 536, 555, 85 S.Ct. 453, 464–65, 13 L.Ed.2d 471 (1965))("the First and Fourteenth Amendments [do not] afford the same kind of freedom to those who would communicate ideas by conduct such as patrolling, marching, and picketing on streets and high-

ways, as these amendments afford to those who communicate ideas by pure speech").

In sum, both of the contested regulations constitute reasonable restrictions on the time, place, and manner of First Amendment expression at Liberty Island, and Sued therefore is not entitled to dismissal of two of the three citations against him on the theory that the regulations are facially invalid.

## CONCLUSION

Defendant Sued's motion to dismiss the citations is denied. Accordingly, trial of this action will take place before me in Courtroom 5–A on May 23, 2001, at 10:00 a.m., unless Sued has paid the indicated fines by that date.[2]

---

**2.** If the indicated trial date is inconvenient, counsel should contact my Chambers to schedule a different trial date.