*308 OPINION OF THE COURT
Andrew M. Engel, J.
Background
On August 1, 2006 the defendant was charged with violating Code of the Town of Oyster Bay (Code) § 168-16 for distributing leaflets on behalf of “Jews for Jesus” in John J. Burns Town Park, without a permit. Following the defendant’s challenge, that section of the Code was declared unconstitutional, on its face and as applied to the defendant; and, the charges against her were dismissed.
On or about July 3, 2007, the Commissioner of the Department of Parks of the Town of Oyster Bay issued a new set of Town of Oyster Bay Department of Parks Rules and Regulations (Regulations) addressing, inter alia, leafleting in the town parks. These Regulations were
“enacted, pursuant to the authority conferred by the Supervisor and the Code of the Town of Oyster Bay, to avoid overcrowding and overlapping activities, to preserve peace and tranquility, to prevent dangers to public health or safety, and to minimize damage to park resources and facilities, and to preserve the parks of the Town of Oyster Bay in an attractive and intact condition.” (Regulations § 2.)
The new Regulations define “Demonstration” as “a group activity including but not limited to . . . dissemination of materials, or activity involving 20 or fewer people for which specific space is requested to be reserved.” “Special Event” is defined as “a group activity including, but not limited to, a performance, meeting, assembly, contest, exhibit, ceremony, parade, athletic competition, reading, or picnic involving 20 or more people, for which specific space is requested to be reserved. Special Event shall not include casual park use by visitors or tourists.” Section 3 (a) (1) of the Regulations provides that “[n]o person shall hold or sponsor any special event or demonstration in Town Parks without a Permit.” Section 3 (f) provides, in pertinent part:
“(2) No person shall engage in the distribution of printed or similarly expressive material without a permit issued by the Commissioner. Such permit shall be issued without regard to content of materials. A permit shall be issued in accordance with the provisions of these rules, and shall only be denied if *309 the activities covered by a prior permit or permits do not reasonably] allow multiple or further occupancy of the particular area or where the number of persons engaged in the sale or distribution exceeds the number that can reasonably be accommodated in the particular location applied for, or if within the preceding two years, the applicant has been granted a permit and did, on that prior occasion, knowingly violate a material term or condition of the permit, or any law, ordinance, statute or regulation relating to the use of the parks. Permits shall limit permit holders to no more than four (4) persons distributing printed matter at any given time. In order to limit the likelihood of littering by disinterested recipients of the distributed material and to minimize unwanted intrusion on the park users’ quiet enjoyment of the park space, distribution of printed or similarly expressive material may occur only upon an indication of interest by the recipient, and only from a stationary table in a fixed location specified in the permit. The location (s) in which such activity shall be permitted in each park has been selected by the Commissioner after consultation with the Department of Public Safety and the Town Attorney. Maps delineating such areas in each park shall be available for public use and inspection at the Office of the Commissioner.
“(3) In all instances where persons shall engage in the distribution of any non-commercial products or materials, printed or otherwise, a maintenance deposit in the sum of one hundred fifty ($150.00) dollars shall be required to ensure the cleanup of any of the products or materials in the park. Said sum shall be returned, in whole or part, should same or any part thereof not be necessary for such cleanup after the time of the permit. Such refund shall occur within five (5) business days of the expiration of the permit.
“(4) In all instances where the permittee requests a permit to distribute expressive material on the date of a scheduled concert, other performance, or special event, such distribution shall terminate no later than fifteen (15) minutes prior to the scheduled time for the commencement of the performance, and may resume fifteen (15) minutes after the conclusion of the performance (the ‘suspension period’). During *310 the suspension period, all printed materials and signage must be removed from public view.
“(5) Applications for permits must be received at least five days prior to the requested date for the activity which is the subject of the permit. Notwithstanding this requirement, the department will accept all applications for activities involving the expression of viewpoints on topical issues whenever submitted and process such applications as soon as it is feasible to do so, considering the magnitude of the event and the resources of the department.”
Section 4 (b) of the Regulations similarly provides, in pertinent part:
“(1) Applications for special event permits must be received at least twenty-one days prior to the requested date for the special event.
“(2) Applications for demonstration permits must be received at least five days prior to the requested date for the demonstration. Notwithstanding this requirement, the department will accept all applications for demonstrations involving the expression of viewpoints on topical issues whenever submitted and process such applications as soon as it is feasible to do so, considering the magnitude of the event and the resources of the department.”
On or about June 24, 2008 the Town Board of the Town of Oyster Bay adopted a local law amending various sections of chapter 168 of the Code, including a new section 168-16, previously declared unconstitutional. This newly enacted section provides:
“A. Legislative intent.
“(1) The Town Board and the residents of the Town of Oyster Bay revere and respect the fundamental rights, provided for by the Constitution of the United States and the Constitution of the State of New York, to free speech, assembly and expression. The Town Board further recognizes that leafleting is a respected tradition in American society, and is a method of communication that has permitted citizens to spread political, religious and commercial messages throughout American history.
“(2) The Town Board recognizes that situations arise when the public health, safety and welfare, the protection of which is the paramount reason for the *311 establishment of government, requires restrictions on the time, place and manner of such speech, assembly, expression and leafleting, without regard to the content of same. The Town Board further recognizes that it has a responsibility to protect its residents from undue interference and harassment in the exercise of their rights to private relaxation, contemplation and enjoyment of their use of Town parks and recreational facilities. Accordingly, the Town Board finds that the Town of Oyster Bay, acting through and by the Commissioner of the Department of Parks, has a legitimate, compelling governmental interest in being able to regulate and control the patrons of its parks and recreational facilities, and the distribution of leaflets, including the number of distributors of said leaflets. A distributor of leaflets may not endanger the safety of patrons or interfere with park activities. The Town Board also finds that such restrictions will also benefit the physical condition of the parks and recreational facilities of the Town of Oyster Bay by limiting the likelihood of littering by patrons of the parks.
“(3) Accordingly, the Town Board finds that, in order to properly balance the aforesaid rights and duties, regulations must be promulgated with respect to the use of Town parks and recreational facilities.
“B. No person shall erect any structure, stand or platform; conduct any parade, drill or maneuver of any kind, form any procession for a parade or proceed in the park; hold any meeting; perform any ceremony; exhibit or distribute any sign, placard, notice, leaflet, declaration or appeal of any kind or description; exhibit any performance or show of any kind or nature; or run or race any horse or other animal, or, being in or on a vehicle, race with another vehicle or horse, in any park or beach except by permit issued by the Commissioner of the Department of Parks. The Commissioner shall promulgate such regulations as may be necessary and appropriate to issue and enforce such permits, consistent with the legislative intent set forth herein, as approved by the Town Board.”
Facts
The facts giving rise to the instant prosecution are not in dispute. On July 29, 2008 the Town of Oyster Bay was sponsor *312 ing a free outdoor concert in John J. Burns Town Park, as part of the Town’s “Music Under the Stars” concert series. The concert drew a crowd of between 8,000 and 9,000 people. On that evening the defendant and a gentleman named Larry Stamm, each missionaries affiliated with Jews for Jesus, entered the park to “share [their] organization’s message and provide additional information about [their] views to those who expressed [an] interest.” (Mendelson affidavit, Aug. 22, 2008, ¶ 3.) Neither the defendant nor Mr. Stamm had applied for, or received, a permit to distribute literature that evening.
The defendant and Mr. Stamm circulated among concertgoers, who were seated on chairs and blankets waiting for the concert to begin, engaging them in conversation and handing out literature. At that same time, a candidate for judicial office was circulating among the crowd speaking with concertgoers and distributing literature from a table at a fixed location provided by the Town. This candidate had been issued a permit for her activities that evening. Similarly, a commercial sponsor of the evening’s concert was handing out commercial advertisements from fixed locations at the entrances to the concert venue.
The defendant and Mr. Stamm were then approached by the Town’s Commissioner of the Department of Public Safety who advised the defendant that a permit was required to distribute literature and that the Town would allow her to apply for such a permit on the spot. The defendant was further advised that she would be issued the necessary permit and would be allowed to distribute her literature from a table “in close visible proximity to the back of the crowd.” (McCaffrey affidavit, Nov. 20, 2008, ¶ 6.) The defendant declined this offer and advised that she and Mr. Stamm “were going to continue conversing with park patrons and distributing literature while walking around.” (Mendelson affidavit, Aug. 22, 2008, ¶ 4.) Ms. Mendelson was told that she would then have to leave the park or the police would be called to arrest and evict her.
After the defendant had continued speaking with concertgoers and handing out literature for about 20 minutes, while being followed by a town public safety officer, Nassau County police officers arrived and twice told her that she could not hand out literature without a permit and that a permit would be issued to her, allowing her to distribute same from a table set up for that purpose. The defendant again refused to accept a permit, distribute her literature from a fixed table or leave the *313 park. The defendant was then place under arrest and charged with offering printed material without a permit, in violation of Code § 168-16, and trespass, in violation of Penal Law § 140.05. At the defendant’s request, Mr. Stamm was not arrested and was permitted to leave the park.
Arguments
The defendant now moves, pursuant to CPL 170.30 (1) (a), to dismiss the charges against her on the grounds that Code § 168-16 is unconstitutional on its face and as applied to her. The defendant suggests that the trespass charge is predicated on a finding that her actions and presence in the park were unlawful and must “rise[ ] and fall[ ] with a finding on the Town ordinance.” (Defendant’s mem of law in support at 7 n 3.)
The defendant argues that, on its face, the Code continues to be an abridgment of her constitutional right to free speech by requiring individuals to obtain a permit before they can engage in any free speech activities involving the distribution of literature in the town parks, making no distinction between days when there are special events taking place in the park and days when no such events are taking place. The defendant further argues that the Commissioner of the Department of Parks is given too much discretion in determining when and to whom permits will be issued, as well as the location of the tables from which permitees will be allowed to distribute their literature. The defendant also objects to that provision of the Code which requires a $150 maintenance deposit. While recognizing that the Town may reasonably regulate the time, place and manner of speech in a public forum, such as a park, the defendant argues that the Code herein is neither content neutral nor narrowly tailored to meet a compelling governmental interest.
The defendant further argues that the Code is unconstitutional as applied to her, given the fact that she was the only one arrested on the evening in question. The defendant also suggests that Code § 168-16 was enacted in response to the prior version thereof having been declared unconstitutional, in a direct effort to impair her rights under the Free Exercise Clause of the First Amendment of the United States Constitution. In this regard, the defendant points to Code § 130-2, which she argues provides “safe harbor” to commercial handbillers, distinct from the religious material she seeks to distribute.
In opposing the defendant’s motion, the People argue that the newly drafted Code § 168-16 and the Regulations implementing *314 same are lawful and constitutional time, place and manner restrictions balancing the defendant’s free speech rights and the Town’s interests in preserving and protecting its parks and park patrons. The People advise that the Code and the Regulations here under consideration are consistent with similar regulations adopted by the United States National Park Service and the City of New York, which have been upheld in United States v Kistner (68 F3d 218 [8th Cir 1995]) and Paulsen v Gotbaum (982 F2d 825 [2d Cir 1992]), respectively. The People argue that the Code and the Regulations are content neutral, narrowly tailored to meet a significant governmental interest and leave open ample alternative channels for communication.
Addressing the defendant’s “as applied” argument, the People allege that the defendant lacks standing to raise same and/or that this claim lacks merit. The People argue that the fact that the defendant’s message was religious in content is irrelevant, given the fact that the Code is content neutral. The People further argue that Code § 130-2 is not a “safe harbor” provision for commercial speech, but is, in fact, a further restriction on such speech. Finally, the People point out that the judicial candidate present in the park the same night the defendant was arrested had a permit and was distributing literature from a fixed table in accordance with her permit, and that the commercial entity present was a paying sponsor of the event.
Standing
Having failed to apply for a license and, moreover, having refused to accept a permit when offered to her, the defendant lacks standing to challenge the constitutionality of the Code as applied to her. (See United States v Sued, 143 F Supp 2d 346 [SD NY 2001].) Nevertheless,
“[i]n the area of freedom of expression it is well established that one has standing to challenge a statute on the ground that it delegates overly broad licensing discretion to an administrative office, whether or not his conduct could be proscribed by a properly drawn statute, and whether or not he applied for a license.” (Freedman v Maryland, 380 US 51, 56 [1965]; see also Lovell v City of Griffin, 303 US 444 [1938].)
Accordingly, the defendant has standing to challenge the constitutionality of the Code on its face.
*315 Discussion
It is well established that all “[legislative enactments enjoy a strong presumption of constitutionality (see Paterson v University of State of N.Y., 14 NY2d 432, 438 [1964]).” (LaValle v Hayden, 98 NY2d 155, 161 [2002].) The presumption of constitutionality applies to municipal ordinances as well as statutes. (Matter of Council of City of N.Y. v Bloomberg, 6 NY3d 380 [2006]; Lighthouse Shores v Town of Islip, 41 NY2d 7 [1976].) “This presumption of statutory validity, however, has less force when a classification turns on the subject matter of expression.” (Erznoznik v Jacksonville, 422 US 205, 215 [1975].) Nevertheless, “statutes will be interpreted to avoid constitutional difficulties.” (Frisby v Schultz, 487 US 474, 483 [1988].)
“Freedom of speech and freedom of the press, which are protected by the First Amendment from infringement by Congress, are among the fundamental personal rights and liberties which are protected by the Fourteenth Amendment from invasion by state action.” (Lovell v City of Griffin at 450; see also Hill v Colorado, 530 US 703 [2000]; Schneider v State [Town of Irvington], 308 US 147 [1939].) “[M]unicipal ordinances adopted under state authority constitute state action” (Staub v City of Baxley, 355 US 313, 321 [1958]) and are similarly within the penumbra of these amendments. (Carlson v California, 310 US 106 [1940].) “There is no doubt that as a general matter peaceful . . . leafletting [is an] expressive activity] involving ‘speech’ protected by the First Amendment.” (United States v Grace, 461 US 171, 176 [1983]; see also Martin v City of Struthers, 319 US 141 [1943]; SHAD Alliance v Smith Haven Mall, 66 NY2d 496 [1985].)
“[P]rior restraints on speech and publication are the most serious and the least tolerable infringement on First Amendment rights.” (Nebraska Press Assn. v Stuart, 427 US 539, 559 [1976]; see also John Doe, Inc. v Mukasey, 549 F3d 861 [2d Cir 2008]; United States v Quattrone, 402 F3d 304 [2d Cir 2005].) “Any system of prior restraints of expression comes to this Court bearing a heavy presumption against its constitutional validity.” (Bantam Books, Inc. v Sullivan, 372 US 58, 70 [1963]; Matter of Gannett Co. v De Pasquale, 43 NY2d 370 [1977].) Regulations conditioning expressive activity, such as leafleting, upon obtaining a permit constitute a prior restraint on such speech. (Beal v Stern, 184 F3d 117 [2d Cir 1999]; MacDonald v Safir, 206 F3d 183 [2d Cir 2000].) Such a determination, however, is not the end of the court’s inquiry into the constitu *316 tional validity of the ordinance in question. (Beal v Stern, supra; Lusk v Village of Cold Spring, 475 F3d 480 [2d Cir 2007].)
“[T]he First and Fourteenth Amendments have never been thought to give absolute protection to every individual to speak whenever or wherever he pleases or to use any form of address in any circumstances that he chooses.” (Cohen v California, 403 US 15, 19 [1971]; see also People v Shack, 86 NY2d 529 [1995].) While parks “have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions . . . [and have] been a part of the privileges, immunities, rights, and liberties of citizens” (Hague v Committee for Industrial Organization, 307 US 496, 515 [1939]; see also Shuttlesworth v Birmingham, 394 US 147 [1969]), the use of parks for such purposes is not absolute. (Hague v Committee for Industrial Organization, supra; Beal v Stern, supra.)
“Written expression in a public park is subject to reasonable time, place, or manner restrictions” (United States v Kistner at 221; see also Heffron v International Soc. for Krishna Consciousness, Inc., 452 US 640 [1981]), provided such restrictions are content neutral, narrowly tailored to meet a significant governmental interest and leave open ample alternatives for communication and expression. (Clark v Community for Creative Non-Violence, 468 US 288 [1984]; Paulsen v Gotbaum, supra; Irish Lesbian & Gay Org. v Giuliani, 918 F Supp 732 [SD NY 1996].)
A. Content Neutrality
“The principal inquiry in determining content neutrality, in speech cases generally and in time, place, or manner cases in particular, is whether the government has adopted a regulation of speech because of disagreement with the message it conveys.” (Ward v Rock Against Racism, 491 US 781, 791 [1989]; see also National Endowment for Arts v Finley, 524 US 569 [1998]; People v Barton, 8 NY3d 70 [2006].) The regulation will be considered content neutral if its enactment can be “justified without reference to the content of the regulated speech.” (Matter of Town of Islip v Caviglia, 73 NY2d 544, 558 [1989]; see also Watchtower Bible & Tract Soc. of N. Y., Inc. v Village of Stratton, 536 US 150 [2002]; Clark v Community for Creative Non-Violence, supra.)
There is nothing on the face of the Code or its implementing regulations to suggest that they are anything but content *317 neutral. (See Thomas v Chicago Park Dist., 534 US 316 [2002]; National Council of Arab Ams. v City of New York, 331 F Supp 2d 258 [SD NY 2004].) Code § 168-16 (B) explicitly states that “[n]o person” shall participate in a number of enumerated activities, some of which include forms of expression, without obtaining a permit. This section clearly does not take into account the organization, speaker, or message as a condition for requiring a permit. Similarly, section 3 (a) (1) of the Regulations provides, without reference to organization, speaker or message, that “[n]o person shall hold or sponsor any special event or demonstration in Town Parks without a permit.” Moreover, section 3 (f) (2) of the Regulations mandates that “[a] permit shall be issued” (emphasis supplied; see United States v Kistner, supra; United States v Sued, supra), and “shall only be denied” in three specific circumstances, involving overlapping activities, overcrowding and prior violations of permits, which have been found to be appropriate content neutral regulations. (See United States v Kistner, supra; National Council of Arab Ams. v City of New York, supra.)
The defendant’s reliance on section 3 (f) (5) of the Regulations as evidence of the absence of content neutrality is misplaced. That section’s reference to considerations of the “magnitude of the event,” when considering permit applications submitted less than five days before the requested date, clearly does not refer to the content of the message, but to the size of the event. It is not at all unreasonable for the Town to consider the size of an event, in conjunction with the “resources of the department,” for purposes of considering the effect upon the park of a large scale event and the department’s ability to handle same on short notice. (See National Council of Arab Ams. v City of New York at 269 [consideration of the “nature” of an event relates to effect of the event on the park and the surrounding areas and not to the content or message of the applicant].)
The defendant’s reliance on section 3 (f) (1) is similarly misplaced, as is her reliance on Code § 130-2. By any fair reading of section 3 (f) (1) it is clear that this section has no application to the matter before the court. This section clearly applies to “the non-commercial distribution of products and/or materials,” as opposed to “the distribution of printed or similarly expressive material” addressed in section 3 (f) (2). Similarly, Code § 130-2, which prohibits the distribution of “any commercial handbill, circular, card, booklet or other similar com *318 mercial or advertising matter or publication . . . unless the name and address of the distributor thereof are clearly and boldly printed thereon” is not a safe harbor provision, allowing such material to be distributed without a permit. There is nothing in the Code or the implementing rules and regulations which removes commercial literature from the ambit of section 3 (f) (2), requiring the issuance of a permit. Clearly, Code § 130-2 is an additional restriction on distribution of commercial written material, not an easing of the permit requirement based upon the content of the commercial speech.
B. Narrowly Tailored to Meet Substantial Governmental Interest
“A statute is narrowly tailored if it targets and eliminates no more than the exact source of the ‘evil’ it seeks to remedy.” (Frisby v Schultz at 485; see also Hobbs v County of Westchester, 397 F3d 133 [2d Cir 2005].) Narrowly tailored does not mean the least restrictive or intrusive regulation (Ward v Rock Against Racism, supra; Irish Lesbian & Gay Org. v Giuliani, supra; United for Peace & Justice v City of New York, 323 F3d 175 [2d Cir 2003]; People v Barton, supra), but one which “promotes a substantial government interest that would be achieved less effectively absent the regulation.” (United States v Albertini, 472 US 675, 689 [1985]; see also Ward v Rock Against Racism, supra; Town of Islip v Caviglia, supra.)
Regulations aimed at regulating the flow of crowds, the safety of the public and the convenience of individuals in public fora have been recognized to serve a valid governmental interest (Paulsen v Gotbaum, supra; Heffron v International Soc. for Krishna Consciousness, Inc., supra), as have regulations aimed at preserving parks in an attractive and intact condition, free from litter. (United States v Kistner, supra; Clark v Community for Creative Non-Violence, supra; Paulsen v Gotbaum, supra.) Provided the regulations are narrowly tailored to meet these ends,
“the time, place, or manner decisions [do not] assign to the judiciary the authority to replace the [Parks Department] as the manager of the [Town’s] parks or endow the judiciary with the competence to judge how much protection of park lands is wise and how that level of conservation is to be attained.” (Clark v Community for Creative Non-Violence at 299; see also Paulsen v Gotbaum, supra.)
It is clear that the Town of Oyster Bay has a significant governmental interest in protecting the health, safety, and *319 welfare of its residents, and their right to relaxation, contemplation and enjoyment of their town parks, free from undue interference and harassment, along with preserving the park space in an attractive and intact condition, free from litter, as indicated in the Code’s legislative intent.
It is likewise clear that the Town made a good faith effort to redraft its Code and establish regulations implementing same, consistent with similar rules and regulations adopted by the City of New York, the constitutionality of which was upheld in Paulsen v Gotbaum (supra). The provisions of the Code and the Regulations specifically addressed to “special events” and “demonstrations,” found in section 4 of the Regulations, do not provide the Commissioner of the Department of Parks with unfettered discretion in determining who may and who may not receive a permit for these purposes. Section 4 (c) sets forth just five specific grounds upon which the Commissioner may deny such a permit, including protection of the environmental conditions at a particular site, lack of suitability of a specialized area, i.e., a swimming pool or skating rink, the previous issuance of a permit for the location requested, that the applicant knowingly violated the terms of a prior permit in the preceding two years, and unreasonable interference with the enjoyment of the park by others. This section provides a detailed application process, including consideration of tardy applications, and an appeals process, should an application be denied.
C. Ample Alternatives
“Whether ample alternatives are available [for communication and expression] does not depend on the preference of the speaker for one method or another.” (Irish Lesbian & Gay Org. v Giuliani at 744; see also United for Peace & Justice v City of New York, supra; Million Youth March, Inc. v Safir, 18 F Supp 2d 334 [SD NY 1998].) “The First Amendment . . . does not guarantee . . . access to every or even the best channels or locations for . . . expression.” (Carew-Reid v Metropolitan Transp. Auth., 903 F2d 914, 919 [2d Cir 1990]; see also International Action Ctr. v City of New York, 522 F Supp 2d 679 [SD NY 2007]; Toback v City of Long Beach, 948 F Supp 167 [ED NY 1996].) Regulations limiting the areas of parks and times at which there may be leafleting, leaving open other areas, times and methods of communication, have been found to pass constitutional muster. (See Ward v Rock Against Racism, supra [regulation requiring performers to use city’s sound system and sound technician left open all other avenues of communication]; *320 Paulsen v Gotbaum, supra [regulation requiring permit to leaflet from a fixed location on special event days only found constitutional]; United States v Kistner, supra [regulation requiring a permit for the distribution of printed matter from five fixed locations in park during air show upheld]; Heffron v International Soc. for Krishna Consciousness, Inc., supra [state fair rule prohibiting distribution of printed material on fair grounds, except from fixed locations, found constitutional].)
Like the regulations in Paulsen v Gotbaum (supra), Heffron v International Soc. for Krishna Consciousness, Inc. (supra), and United States v Kistner (supra), during special event days or demonstrations, this defendant, and others, are provided with ample alternative opportunities to communicate their message. The defendant, and anyone else for that matter, is free to walk among other park patrons and speak to them, at will, with or without a permit. Once issued a permit, the defendant, and other individuals, are free to distribute their literature from fixed tables in close proximity to the other park patrons. Contrary to the defendant’s suggestion, there is no evidence to suggest that these locations are either selected at random or placed an unreasonable distance from an ongoing event. The location of such tables “has been selected by the Commissioner after consultation with the Department of Public Safety and the Town Attorney” (Regulations § 3 [f] [2]), and maps of the designated areas are available for inspection by any permit applicant at the Office of the Commissioner.
If the foregoing were the entire scope of the Code and the Regulations, the court would have no difficulty finding them to be constitutional. The Town’s good faith notwithstanding, however, the Town did not adopt the New York City regulations upheld in Paulsen v Gotbaum (supra) in their entirety. Although it may have been the Town’s intention to limit the permit requirement to “special events” and “demonstrations,” the Code and section 3 (f) (2) of the Regulations are much broader in their scope and application. Section 168-16 (B) of the Code provides, without limitation, that “[n]o person shall. . .proceed in the park ... or distribute any . . . leaflet . . . except by permit issued by the Commissioner of the Department of Parks.” Similarly, Regulations § 3 (f) (2), which is not contained in the New York City regulations adopted by the Town, provides, without limitation, “No person shall engage in the distribution of printed or similarly expressive material without a permit issued by the Commissioner.” On their faces, these sections do *321 not limit the permit requirement to “special events” or “demonstrations,” but apply to any person, at any time, anywhere in a town park or recreational facility, and remain subject to a constitutional challenge for their overbreadth. As such, the “court’s first task is to determine whether the enactment reaches a substantial amount of constitutionally protected conduct.” (Hoffman Estates v Flipside, Hoffman Estates, Inc., 455 US 489, 494 [1982].)
The People argue that “perfect clarity and precise guidance have never been required even of regulations that restrict expressive activity.” (Ward v Rock Against Racism at 794; see also Groyned v City of Rockford, 408 US 104 [1972].) They further argue that the “court . . . may consider not only the text of the specific statute or regulation, but also how it has been interpreted by the persons who are charged with its implementation, and what their actual practices are.” (United States v Sued at 352; see also Ward v Rock Against Racism, supra; Paulsen v Gotbaum, supra.) In this regard, the People point to the affidavit of Richard T. Betz, the Commissioner of the Department of Parks of the Town of Oyster Bay, who avers that “[o]n non-Special Event days, no permit is required or issued, and no limitation is applied to the distribution of literature.” (Betz affidavit, Nov. 19, 2008, ¶ 7.) The People, however, offer no proof that the Code and the Regulations have been interpreted and applied in this fashion since their implementation. Moreover, Mr. Betz makes other statements which are at odds with the narrow construction he presently seeks to impress upon this court.
Echoing the broad language of the Code and the Regulations, Mr. Betz advises the court that, in accordance with his interpretation of same, “individuals or groups wishing to engage in literature distribution in our parks or beaches must apply for a permit in advance of their scheduled activities.” (Betz affidavit, Nov. 19, 2008, ¶ 7.) In similarly broad, and clarifying language, Mr. Betz advises:
“Section 3 (f) (2) of the Department’s Rules and Regulations is the section of the rules which specifically governs the right to distribute printed or similarly expressive materials within the Town’s public parks and beaches. In brief, section 3 (f) (2), as I interpret and apply it, requires a permit ap-
*322 plication in advance for such activities, and[*] on Special Event days, confines such activities to a fixed location or locations within the park or beach, to be selected by the Department after consultation with the Department of Public Safety and the Town Attorney. . . . Section 3 (f) (2) only applies to the distribution of printed material, e.g., leaflets, flyers, brochures, and other material of that sort.” (Betz affidavit, Nov. 19, 2008, ¶ 11 [emphasis added].)
As can be seen therefrom, contrary to the People’s argument that the Town has narrowly construed these regulations to apply only to special event or demonstration days, Mr. Betz states that the permit requirement for literature distribution applies to all such distribution and singles out special event days only for requiring such distribution from a fixed location.
This broad interpretation is further borne out by the fact that section 3 (f) (4) of the Regulations distinguishes special event days from non-special event days by requiring,
“In all instances where the permitee requests a permit to distribute expressive material on the date of a scheduled concert, other performance, or special event, such distribution shall terminate no later than fifteen (15) minutes prior to the scheduled time for the commencement of the performance, and may resume fifteen (15) minutes after the conclusion of the performance (the ‘suspension period’).”
If section 3 (f) (2) were to be interpreted as the People suggest, the first phrase of section 3 (f) (4) would be entirely superfluous, as all permit requests would be limited to such special event days. Further belying the People’s attempt to now narrowly construe the Code and Regulations is the fact that the latter contains a section 4, entitled “Special Events and Demonstrations,” which sets forth a separate application procedure; and, section 4 (c) contains separate specific grounds upon which a special event or demonstration permit may be denied, as distinguished from the grounds for denial of a permit of general application, as set forth in section 3 (f) (2).
As noted in Beal v Stern (at 127 n 7), “Although an agency’s interpretation is relevant to a facial challenge, [the court] may *323 not simply presume that an agency or official will adhere to standards not evident on the regulation’s face or embodied in authoritative decisions or practice.” (See also City of Lakewood v Plain Dealer Publishing Co., 486 US 750 [1988]; People v Bezjak, 11 Misc 3d 424 [Crim Ct, NY County 2006].) “[I]n a facial challenge the Commissioner’s actions towards [this defendant] is relevant only as evidence to support or rebut the Parks Department’s claimed practice with respect to [the provisions in question].” (Beal v Stern at 127 n 8.) As indicated, the People offer no other evidence to support the narrow interpretation they would now have the court adopt. Moreover, “post hoc rationalizations by the licensing official and the use of shifting or illegitimate criteria are far too easy, making it difficult for courts to determine in any particular case whether the licensor is permitting favorable, and suppressing unfavorable, expression.” (City of Lakewood v Plain Dealer Publishing Co. at 758.)
Although the court has little doubt that the Town acted in good faith in attempting to redraft its Code and implementing regulations to pass constitutional muster; and, accepting the Commissioner’s good faith representation that he will presume that the permit requirement will only apply to special events or demonstrations despite the broad language of the Regulations, “this is the very presumption that the doctrine forbidding unbridled discretion disallows.” (City of Lakewood v Plain Dealer Publishing Co. at 770.) Commissioner Betz’s assurance of a narrow application of the Regulations notwithstanding,
“[p]roof of an abuse of power in the particular case has never been deemed a requisite for attack on the constitutionality of a statute purporting to license the dissemination of ideas. . . . It is not merely the sporadic abuse of power by the censor but the pervasive threat inherent in its very existence that constitutes the danger to freedom of discussion.” {Thornhill v Alabama, 310 US 88, 97 [1940].)
Given the facial overbreadth of the Code and Regulations, as noted hereinabove, the Commissioner’s apparent discretionary interpretation and application thereof, “coupled with the power of prior restraint, intimidates parties into censoring their own speech, even if the discretion and power are never actually abused.” (City of Lakewood v Plain Dealer Publishing Co. at 757; see also Keyishian v Board of Regents of Univ. of State of N. Y, 385 US 589 [1967].) This legislative abridgment may be overcome by a more narrowly drawn ordinance, rules and regulations, specifically limiting the permit requirement for *324 leafleting to special event and demonstration days (see Paulsen v Gotbaum, supra), and removing the overbroad prior restraint the Code and the Regulations presently impose on all other leafleteers.
Based upon all of the foregoing, the court is constrained to find Code of the Town of Oyster Bay § 168-16 and Town of Oyster Bay Department of Parks Rules and Regulations § 3 (f) (2) unconstitutional on their faces. Accordingly, the defendant’s motion to dismiss the information charging her with distributing printed material without a permit, pursuant to CPL 170.30 (1) (a), is granted. The Town Code serving as the underpinning of the trespass charge brought against the defendant, the information charging the defendant with trespass in violation of Penal Law § 140.05 is dismissed as well.

* If, as the People suggest, the entire ordinance and regulatory scheme were directed solely at special events or demonstrations, there would be no need for Mr. Betz to single out special event days for an added requirement of distributing leaflets from a fixed location. In fact, section 3 (f) (2) makes no distinction between special event and non-special event days and the requirement of leafleting from a fixed location.